**Connell Foley LLP**
One Newark Center
1085 Raymond Boulevard, Nineteenth Floor
Newark, New Jersey 07102
(973) 436-5800
Attorneys for Plaintiff, Days Inns Worldwide, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAYS INNS WORLDWIDE, INC., a Delaware Corporation, | : |
| | : |
| Plaintiff, | : Civil Action No. 20-cv |
| | : |
| v. | : |
| | : **COMPLAINT** |
| GOLDEN TREASURY II, LLC, a Washington Limited Liability Company; CHONG S. YI, an individual; and MARGARET YI, an individual, | : |
| | : |
| | : |
| Defendants. | : |
| | : |

Plaintiff Days Inns Worldwide, Inc., by its attorneys, Connell Foley LLP, complaining of defendants, Golden Treasury II, LLC, Chong S. Yi, and Margaret Yi, says:

### PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Days Inns Worldwide, Inc. ("DIW") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

2.      Defendant Golden Treasury II, LLC ("Golden Treasury"), on information and belief, is a limited liability company organized and existing under the laws of the State of Washington, with its principal place of business at 13416 Southeast 53rd Street, Bellevue, Washington 98006.

3.      Defendant Chong S. Yi ("C. Yi"), on information and belief, is a member of Golden Treasury and a citizen of the State of Washington, residing at 13416 Southeast 53rd Street, Bellevue, Washington 98006.

4.      Defendant Margaret Yi ("M. Yi"), on information and belief, is a member of Golden Treasury and a citizen of the State of Washington, residing at 13416 Southeast 53rd Street, Bellevue, Washington 98006.

5.      Upon information and belief, C. Yi and M. Yi are the only constituent members of Golden Treasury.

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the plaintiff and all the defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

7.      This Court has personal jurisdiction over Golden Treasury by virtue of, among other things, section 17.6.3 of the April 18, 2007 license agreement by and between Golden Treasury and DIW (the "License Agreement"), described in more detail below, pursuant to which Golden Treasury has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

8.      This Court has personal jurisdiction over C. Yi and M. Yi by virtue of, among other things, the terms of a guaranty (the "Guaranty"), described in more detail below, pursuant to which C. Yi and M. Yi acknowledged that they were personally bound by section 17 of the License Agreement.

2

9.    Venue is proper in this District pursuant to section 17.6.3 of the License Agreement, inasmuch as that provision contains an express waiver by Golden Treasury of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Agreements Between The Parties

10.    On or about April 18, 2007, DIW entered into the License Agreement with Golden Treasury for the operation of a 55-room guest lodging facility located at 220 Bravo Terrace, Port Orchard, Washington 98366, designated as Site No. 14080-70637-03 (the "Facility").  A true copy of the License Agreement is attached hereto as Exhibit A.

11.    On or about September 24, 2015, DIW and Golden Treasury entered into a SynXis Subscription Agreement (the "SynXis Agreement") which governed Golden Treasury's access to and use of certain computer programs, applications, features, and services, as well as any and all modifications, corrections, updates, and enhancements to same.  A true copy of the SynXis Agreement is attached hereto as Exhibit B.

12.    Pursuant to section 5 of the License Agreement, Golden Treasury was obligated to operate a Days Inn® guest lodging facility for a fifteen-year term.

13.    Pursuant to section 7, section 18.2, section 18.3[1] and Schedule C of the License Agreement, and section 5 of the SynXis Agreement, Golden Treasury was required to make certain periodic payments to DIW for royalties, system assessments, taxes, interest, SynXis fees, and other fees (collectively, "Recurring Fees").

14.    Pursuant to section 7.3 of the License Agreement, Golden Treasury agreed that interest is payable "on any past due amount payable to [DIW] under this [License] Agreement at

---

[1] By Amendment to the License Agreement dated July 28, 2014 (the "Amendment"), a true copy of which is attached hereto as Exhibit C, section 18.3 was added to the License Agreement, modifying the monthly Recurring Fees payable to DIW.

3

the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

15.     Pursuant to section 3.8 of the License Agreement, Golden Treasury was required to disclose to DIW, among other things, the amount of gross room revenue earned by Golden Treasury at the Facility for purposes of establishing the amount of royalties and other Recurring Fees due to DIW.

16.     Pursuant to section 3.8 of the License Agreement, Golden Treasury agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.8 and 4.8 of the License Agreement, Golden Treasury agreed to allow DIW to examine, audit, and make copies of the entries in these books, records, and accounts.

17.     Pursuant to section 9 of the License Agreement, Golden Treasury could not lease the Facility, nor engage in any change, assignment, transfer, conveyance, or pledge of it interest, except with DIW's prior written consent.  Any attempted transfer, assignment, conveyance, or pledge not in accordance with section 9 of the License Agreement would be void as between DIW and Golden Treasury, and would give DIW the right to terminate the License Agreement.

18.     Pursuant to section 11.2 of the License Agreement, DIW could terminate the License Agreement, with notice to Golden Treasury, if Golden Treasury (a) discontinued operating the Facility as a Days Inn® guest lodging establishment, and/or (b) lost possession or the right to possession of the Facility.

19.     Pursuant to section 12.1 of the License Agreement, Golden Treasury agreed that, in the event of a termination of the License Agreement pursuant to section 11.2, it would pay liquidated damages to DIW in accordance with a formula specified in the License Agreement.

20.     Pursuant to section 17.4 of the License Agreement, Golden Treasury agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [License] Agreement or collect amounts owed under this [License] Agreement."

21.     Effective as of the date of the License Agreement, C. Yi and M. Yi provided DIW with a Guaranty of Golden Treasury's obligations under the License Agreement.  A true copy of the Guaranty is attached hereto as Exhibit D.

22.     Pursuant to the terms of the Guaranty, C. Yi and M. Yi agreed, among other things, that upon a default under the License Agreement, they would "immediately make each payment and perform or cause [Golden Treasury] to perform, each unpaid or unperformed obligation of [Golden Treasury] under the [License] Agreement."

23.     Pursuant to the terms of the Guaranty, C. Yi and M. Yi agreed to pay the costs, including reasonable attorneys' fees, incurred by DIW in enforcing its rights or remedies under the Guaranty or the License Agreement.

### The Termination of the License Agreement

24.     By letter dated December 10, 2019, Golden Treasury advised DIW that it planned to sell the Facility on January 7, 2020 to a third party, without prior consent from DIW, thereby unilaterally terminating the License Agreement.

25.     By letter dated January 9, 2020, a true copy of which is attached as Exhibit E, DIW acknowledged Golden Treasury's unilateral termination of the License Agreement, effective January 7, 2020, and advised Golden Treasury that it was required to pay to DIW as liquidated damages for premature termination the sum of $210,700.51 as required under the License Agreement, and all outstanding Recurring Fees through the date of termination.

## FIRST COUNT

26.     DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 25 of the Complaint.

27.     Pursuant to sections 3.8 and 4.8 of the License Agreement, Golden Treasury agreed to allow DIW to examine, audit, and make copies of Golden Treasury's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

28.     The calculation of the monetary amounts sought by DIW in this action is based on the gross room revenue information supplied to DIW by Golden Treasury and, to the extent there has been non-reporting, DIW's estimate as to the gross room revenue earned by Golden Treasury.

29.     The accuracy of this estimate cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Golden Treasury.

**WHEREFORE**, DIW demands judgment ordering that Golden Treasury account to DIW for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility from the inception through the date of termination of the License Agreement.

## SECOND COUNT

30.     DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 29 of the Complaint.

31.     By letter dated January 9, 2020, DIW acknowledged Golden Treasury's unilateral termination of the License Agreement, effective January 7, 2020, when it transferred possession of the Facility to a third party without DIW's consent.

32. Section 12.1 of the License Agreement provides that, in the event of termination of the License Agreement due to action of the Golden Treasury, Golden Treasury shall pay liquidated damages to DIW within 30 days of termination.

33. As a result of the termination of the License Agreement, Golden Treasury is obligated to pay DIW liquidated damages in the amount of $210,700.51, as calculated pursuant to section 12.1 of the License Agreement.

34. Notwithstanding DIW's demand for payment, Golden Treasury has failed to pay DIW the liquidated damages as required in section 12.1 of the License Agreement.

35. DIW has been damaged by Golden Treasury's failure to pay liquidated damages.

**WHEREFORE**, DIW demands judgment against Golden Treasury for liquidated damages in the amount of $210,700.51, together with interest, attorneys' fees, and costs of suit.

## THIRD COUNT

36. DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 35 of the Complaint.

37. By virtue of the premature termination of the License Agreement, DIW sustained a loss of future revenue over the remainder of the 15-year term of the License Agreement.

38. If the Court determines that Golden Treasury is not liable to pay DIW liquidated damages as required by section 12.1 of the License Agreement then, in the alternative, Golden Treasury is liable to DIW for actual damages for the premature termination of the License Agreement.

39. DIW has been damaged by Golden Treasury's breach of its obligation to operate a Days Inn® guest lodging facility for the remaining term of the License Agreement.

**WHEREFORE**, DIW demands judgment against Golden Treasury for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

## FOURTH COUNT

40.    DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 39 of the Complaint.

41.    Pursuant to section 7, section 18.2, section 18.3, and Schedule C of the License Agreement, and section 5 of the SynXis Agreement, Golden Treasury was obligated to remit Recurring Fees to DIW.

42.    Despite its obligation to do so, Golden Treasury failed to remit certain of the Recurring Fees due and owing under the License Agreement in the current amount of $26,187.78.

43.    Golden Treasury's failure to remit the agreed Recurring Fees constitutes a breach of the License Agreement and has damaged DIW.

**WHEREFORE**, DIW demands judgment against Golden Treasury for the Recurring Fees due and owing under the License Agreement, in the current amount of $26,187.78, together with interest, attorneys' fees, and costs of suit.

## FIFTH COUNT

44.    DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 43 of the Complaint.

45.    At the time of the termination of the License Agreement, Golden Treasury was obligated to pay DIW Recurring Fees.

46.    Despite its obligation to do so, Golden Treasury failed to pay certain of the Recurring Fees due and owing under the License Agreement in the current amount of $26,187.78.

47.    Golden Treasury's failure to compensate DIW constitutes unjust enrichment and has damaged DIW.

**WHEREFORE**, DIW demands judgment against Golden Treasury for the Recurring Fees due and owing under the License Agreement, in the current amount of $26,187.78, together with interest, attorneys' fees, and costs of suit.

## SIXTH COUNT

48.    DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 47 of the Complaint.

49.    Pursuant to the terms of the Guaranty, C. Yi and M. Yi agreed, among other things, that upon a default under the License Agreement, they would immediately make each payment and perform each obligation required of Golden Treasury under the License Agreement.

50.    Despite their obligation to do so, C. Yi and M. Yi have failed to make any payments or perform or cause Golden Treasury to perform each obligation required under the License Agreement.

51.    Pursuant to the Guaranty, C. Yi and M. Yi are liable to DIW for Golden Treasury's liquidated damages in the amount of $210,700.51, or actual damages in an amount to be determined at trial, and Golden Treasury's Recurring Fees due and owing under the License Agreement, in the current amount of $26,187.78.

**WHEREFORE**, DIW demands judgment against C. Yi and M. Yi for damages in the amount of all liquidated damages or actual damages and Recurring Fees due and owing under the License Agreement, together with interest, attorneys' fees, and costs of suit.

**Connell Foley LLP**
Attorneys for Plaintiff,
Days Inns Worldwide, Inc.

By: _____
        Bryan P. Couch

Dated:  May 18, 2020

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

**Connell Foley LLP**
Attorneys for Plaintiff,
Days Inns Worldwide, Inc.

By: _____
        Bryan P. Couch

Dated:  May 18, 2020

5378363-1

# EXHIBIT A

Location: Port Orchard, WA
Entity No: 70637
Unit No.: 14080

## DAYS INNS WORLDWIDE, INC.
## LICENSE AGREEMENT

THIS LICENSE AGREEMENT ("Agreement"), dated _____4/18_____, 200_7_, is between DAYS INNS WORLDWIDE, INC., a Delaware corporation ("we", "our", or "us"), and GOLDEN TREASURY II, LLC, a Washington limited liability company ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

This transaction involves the transfer of an existing Chain Facility at the Location first granted to AFK Corporation, ("Prior Licensee"), in a License Agreement with us dated June 11, 2004 (the "Prior Agreement"). You assume and obligate yourself to perform any and all of the obligations (financial and otherwise) of the Prior Licensee under the Prior Agreement that is not paid or performed as of the date of this Agreement, including without limitation, the obligation to pay any unpaid Royalties, System Assessment Fees, Basic Service Charges, or other amounts due us and to correct any uncured defaults other than as expressly superseded by this Agreement. You acknowledge that we may require you or your staff to complete training on the use of a property management or similar computer system for accessing the Reservation System and pay our retraining fee.

**1. License.** We have the exclusive right to license and franchise to you the distinctive "Days Inn" System for providing transient guest lodging services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. You will call the Facility a "Days Inn." You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

**2. Days Inns Licensee Advisory Association.** You will be eligible to participate in the Days Inn Licensee Advisory Association, a Delaware corporation that is the organization of Days Inn System licensees, in accordance with the Bylaws and Certificate of Incorporation of the Association, as amended, so long as you are not in default under this Agreement.

**3. Your Improvement and Operating Obligations.** Your obligations to improve, operate and maintain the Facility are:

3.1 **Improvements.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards for entering conversion facilities. You must begin improvement of the Facility no later than thirty (30) days after the Effective Date. You must thereafter continue renovation and improvement of the Facility as the Punch List requires and pass

1

any related quality assurance inspection we may conduct. All improvements will comply with System Standards, any Approved Plans, Schedule B and any Punch List attached to this Agreement. Your general contractor or you must carry the insurance required under this Agreement during renovation. If you do not commence or complete the improvement of the Facility by the dates specified in this Section 3.1 or complete the post-transfer improvements specified in the Punch List after the Effective Date, then we may, in our sole discretion, terminate this Agreement by giving written notice to you. Time is of the essence for the Improvement Obligation. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. You must also pay us the Reinspection Fee described in Section 3.9 if you fail to complete any Improvement Obligation by the deadline established in the Punch List and our representatives must return to the Facility to inspect it. We may grant you an extension of time to complete the items on your Punch List in our sole discretion. The grant of an extension to perform your Improvement Obligation will not waive any other default existing at the time the extension is granted.

3.2  **Improvement Plans.** You will create plans and specifications for the work described in Section 3.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like. Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements. We will not be liable to your lenders, contractors, employees, guests, others, or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during, or after renovation or construction. Any material variation from the Approved Plans requires our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

3.3  **Opening.** You may continue to identify the Facility as part of the System prior to completing the Improvement Obligation, if any.

3.4  **Operation.** You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual and follow standard industry practices for safeguarding cardholder information, including but not limited to, the Payment Card Industry Data Security Standard. You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility, only with our prior written consent which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of

2

another lodging or housing facility.

3.5 **Training.** You, (or a person with executive authority if you are an entity), and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4.1 we designate as mandatory for licensees and general managers, respectively. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1., and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.6 **Marketing.** You will participate in System marketing programs, including the Directory and the Reservation System. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.6.1 You may participate in any regional marketing, training or management alliance or cooperative of Chain licensees formed to serve the Chain Facilities in your area. We may assist the cooperative collect contributions. You may be excluded from cooperative programs and benefits if you don't participate in all cooperative programs according to their terms, including making payments and contributions when due.

3.6.2 The Facility must participate in our Chain-wide Internet marketing activities like other marketing programs. You shall provide us with information and photographs of the Facility in accordance with System Standards for posting on the Chain website. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with Chain-wide Internet marketing activities. You must honor the terms of any participation agreement you sign for Internet marketing. You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis, provided that the activities carry aggregate fees per transaction of not more than the sum of the full agent commission specified on Schedule C for sales agents, plus 10% of the Chain's reported average daily rate for the preceding calendar year. We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement.

DAYEXCI
216548  03/07

**3.7  Governmental Matters.**  You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote.  You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings.  You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

**3.8  Financial Books & Records; Audits.**

3.8.1  The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards.  You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.8.2  Upon our request, you will send to us copies of financial statements, tax returns, and other records relating to the Facility for the applicable accounting period that we require under this Agreement and System Standards. We may notify you of a date on which we propose to audit the Facility's books and records at the Facility.  You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date.  You need to inform us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements for the Facility. We may also perform an audit of the Facility's books and records without advance notice.  Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.8.3  We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.8.2 within 30 days after the date of the initial audit, (ii) you cancel 2 or more previously scheduled audits, (iii) you refuse to admit our auditors during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records at the audit or send them to us as required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit.  Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.8, an "Accounting Procedure Notice."  You must also pay any deficiency in Recurring Fees, any Audit Fee we assess you for your default of Section 3.8 as described in Section 4.8, and/or other charges we identify and invoice as a result of the audit. The Accounting Procedure Notice requires that you obtain and

deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.9  **Inspections.**  You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement.  You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice.  The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection.  If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any Reinspection Fee specified in System Standards Manuals plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection.  You will also be charged the Reinspection Fee if we must return to the Facility to inspect it as a result of your failure to complete any Improvement Obligation by the deadline established in the Punch List, as set forth in Section 3.1.  We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score.  We may publish and disclose the results of quality assurance inspections and guest surveys.

3.10  **Insurance.**  You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual.  Unless we instruct you otherwise, your liability insurance policies will name Days Inns Worldwide, Inc., Wyndham Worldwide Corporation, Wyndham Hotel Group, LLC, their current and former affiliates, successors and assigns as additional insureds.

3.11  **Conferences.**  You (or your representative with executive authority if you are an entity) will attend each annual Chain conference and pay the Conference Fee we set for the Chain licensees, if and when we determine to hold an annual Chain conference.  Mandatory recurrent training for licensees and managers described in Section 4.1.4 may be held at a conference.  The Fee will be the same for all Chain Facilities that we license in the United States.  You will receive reasonable notice of a Chain conference.

3.12  **Purchasing and Other Services.**  You will purchase or obtain certain items we designate as proprietary or that bear or depict the Marks, such as signage, only from suppliers we approve. You may purchase other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards. We may offer optional architectural and design services for the Facility for a separate fee.

3.13  **Good Will.**  You will use reasonable efforts to protect, maintain and promote the name "Days Inn" and its distinguishing characteristics, and the other Marks.  You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System.

DAYEXCI
216548 03/07

You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.

3.14 **Facility Modifications.** You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay. You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility. If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay. You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.15 **Courtesy Lodging.** You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

3.16 **Minor Renovations.** Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 60 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount. You will perform the Minor Renovations as and when the Minor Renovation Notice requires. We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged no more than 200 points and the most recent quality assurance inspection score for the Facility was no more than 225 points (or equivalent scores under a successor quality assurance scoring system we employ), when the Facility is otherwise eligible for a Minor Renovation.

4. **Our Operating and Service Obligations.** We will provide you with the following services and assistance:

4.1 **Training.** We may offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager and owner orientation training, remedial training and supplemental training.

4.1.1 **General Manager Orientation Training.** We will offer at a location in the United States we designate a general manager orientation training program. The program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility. We may also offer certain Internet-based training as a supplement to the classroom training experience. Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 90 days after the Opening Date. Any replacement general manager must complete general manager orientation to our satisfaction within 90 days after he/she assumes the position. If we do not offer a place in general manager orientation within the above time frame, your

6

replacement general manager must attend the next program held at which we offer a place. Your general manager for the Facility must complete general manager orientation even if you employ managers at other Chain Facilities who have already received this training. We charge you tuition for general manager orientation which is payable before the scheduled date of the program. The tuition for your first general manager is $1,250 if he/she attends orientation within the time period required under this section. For any replacement general manager, you must pay the tuition in effect for the program when your manager attends the program. You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits. We may, at our option, automatically schedule your initial or replacement general manager for a class to be held within the required time period   (an "auto-assigned class") and invoice you when we notify you about the date of the class. If your general manager is unable to attend that class, you must notify us at least 15 days before the training start date and re-schedule the general manager for another class to be held within the 90 day period. We may charge you "No-Show Fees" or "Cancellation Fees" if your general manager fails to attend orientation within the required time period or fails to attend a program we have scheduled for him or her without giving us at least 15 days notice of cancellation. This is in addition to the tuition you must pay us for your general manager at the then then in effect rate when he/she attends orientation. See Section 4.1.5.

4.1.2 **Owner Orientation Training.**   We will offer an owner orientation training program to familiarize you with the System, the Chain, and our services.   If this is your first System franchise, you (or a person with executive authority if you are an entity) must attend owner orientation preferably within 60 days before, but no later than 60 days after, the Opening Date. If we do not offer a place in owner orientation within this time period, you must attend the next program held at which we offer a place.   Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option. We charge you tuition of $825 which is payable before the scheduled date for the program.   You must also pay for your travel, lodging, meal and incidental expenses. If you are unable to attend an orientation program that you have scheduled with us, you must notify us at least 15 days before the start date and schedule attendance at another class to be held within the 90 day period.   We may charge you No-Show or Cancellation Fees if you fail to attend any mandatory orientation program within the required time period or fail to attend a program we have scheduled for you without giving us at least 15 days notice of cancellation. See Section 4.1.5.

4.1.3 **Remedial Training.** We may require you, your general manager and/or your staff to participate in remedial training if the Facility fails multiple quality assurance inspections and/or experiences significant complaints to our guest services department, as a condition to avoiding termination or to resumption of reservation service. This training may be offered at our corporate offices, at a regional location, on-line or at the Facility. You must pay the tuition in effect for this program when it is offered to you. If the training is provided at the Facility, you must provide lodging for our trainers. Tuition for remedial training must be paid before the training commences. The length of the remedial training could be up to five days, depending on the severity of the quality assurance and/or customer service issues.

4.1.4 **Supplemental Training.** We may offer other mandatory or optional training programs for reasonable tuition or without charge. This training could be offered in our U.S. training center or other locations or held in conjunction with a Chain lodging conference.   You will pay for your

representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

4.1.5 **No-Show and Cancellation Fees.** If you or your general manager fails to attend orientation within the required time period, or fails to attend a training program as scheduled (including any auto-assigned class) without notifying us in advance, we may charge you a No-Show Fee of up to 100% of the tuition for the program. If you or any other member of your staff cancel participation in any training program less than 15 days before it is scheduled to be held, we may charge you a Cancellation Fee of up to 50% of the tuition for the program as we establish from time to time. No-Show and Cancellation Fees are in addition to the tuition you will have to pay at the then offered rate when you or your general manager attends the program. We may assess you additional No-Show or Cancellation Fees for continued failures by you under Section 4.1.

4.2 **Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use the Basic Service Charge for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance for the software we license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us or our affiliate. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties.

4.3 **Marketing.**

4.3.1 We will promote public awareness and usage of Chain Facilities by implementing advertising, promotion, publicity, market research and other marketing programs, training programs and related activities, and the production and distribution of Chain publications and directories of hotels. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. We or an affiliate may be reimbursed for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement or advance funds available from System licensees to pay for marketing activities. We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

4.3.2 We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3 We will publish the Chain Directory. We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this

Agreement at the time we must arrange for publication. We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.4 **Purchasing.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

4.5 **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

4.6 **Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on Facility operation and marketing through our representatives. We will offer you access to any Internet website we may maintain to provide Chain licensees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

4.7 **System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send you all other publications for Chain licensees and all separate policy statements in effect from time to time.

4.8 **Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.9. You will pay us an "Audit Fee" of $1,000.00 when we invoice you for an Audit Fee under Section 3.8. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs, but not more than 5% per year on a cumulative basis. Our inspections are solely for the purposes of checking compliance with System Standards.

5. **Term.** The Term begins on the Effective Date and expires at the end of the fifteenth License Year. Some of your duties and obligations will survive termination or expiration of this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

6. **Application and Initial Fees.** We should receive from you a non-refundable Application Fee of

9

$1,000.00. You will pay us a non-refundable Relicense Fee in the amount of **$24,000.00** when you sign this Agreement, which is fully earned when we sign this Agreement.

### 7. Recurring Fees, Taxes and Interest.

7.1 You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States). The Royalty, System Assessment Fees and Basic Service Charge described in Section 7.1 are payable ten days after the month in which they accrue, without billing or demand. Other Recurring Fees are payable at the times set forth in the System Standards. Recurring Fees include the following:

7.1.1 A "Royalty" equal to five percent (5.0%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2 "System Assessment Fees," including a "Basic Service Charge" as set forth in Schedule C for advertising, marketing, training, the Reservation System and other related services and programs, and the specific additional charges and fees referred to in Schedule C or Section 4.2 of this Agreement as "Additional Charges," accrues from the Opening Date until the end of the Term, including during reservation suspension periods. We will allocate at least 39% of the Basic Service Charge to advertising, marketing and related services and programs. We reserve the right to increase or modify the System Assessment Fees for all Chain Facilities, and to add other fees and charges for new services, at our sole discretion as to amount or formula, from time to time, but with at least 30 days prior written notice and after consultation with the Days Inns Franchisee Advisory Association Board of Directors, by substituting a new Schedule C or otherwise, to reflect changes in the fully allocated costs of providing marketing and reservation services, and to add, drop or modify the types of services we offer. You will also pay or reimburse us for travel and other agent commissions paid for certain reservations at the Facility and a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet and other reservation systems and networks. We may charge a reasonable service fee for this service. We, or our affiliates, may charge Facilities using the System outside the United States using a different formula.

7.2 You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for the privilege of doing business by us in your State. You will pay Taxes to us when due.

7.3 "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4 If a transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new licensee for the Facility.

### 8. Indemnifications.

8.1  Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven.  You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury.  This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2  You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee.  You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest.  We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3  We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name.  You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you.  You will cooperate with our defense and resolution of the claim.  We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9.  Your Assignments, Transfers and Conveyances.

9.1  **Transfer of the Facility.**  This Agreement is personal to you (and your owners if you are an entity).  We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you.  You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent.  If a Transfer is to occur, the transferee or you must comply with Section 9.3.  Your License is subject to termination when the Transfer occurs.  The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility.  The transferee may not operate the Facility under the System, and you are responsible for

DAYEXC1
216548  03/07

performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2 **Public Offerings and Registered Securities.** You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3 **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a licensee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new license applicant, pay the Application and Relicense Fees then in effect, sign the form of License Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were an existing facility converting to the System, as we reasonably determine. We will provide a Punch List of improvements we will require after the transferee's Application is submitted to us. We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities, or in the alternative, condition our approval of the Transfer on one or more of the following: limit the transferee's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the License when you sell the Facility and pay us Liquidated Damages under Section 12.1 at the same rate as you would pay if the termination occurred before the Opening Date. Such payment would be due and payable when you transfer possession of the Facility. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

9.4 **Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the License Agreement form then offered prospective licensees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you

12

transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

9.5 **Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

9.6 **Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

10. **Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

11. **Default and Termination.**

11.1 **Default.** In addition to the matters identified in Sections 3.1 and 3.8, you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section 11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed. In the case of default resulting from the Facility's failure to meet Quality Standards as measured by a quality assurance inspection, you must act diligently to cure the default and resolve health, safety, cleanliness and housekeeping failures identified in the inspection report within 30 days after the failing inspection. Within 90 days after the failing inspection, you must also cure the remaining items identified in the inspection report and renovate and improve the Facility to meet our then current System Standards for entering conversion properties (or other standards specified under System Standards if we are not then accepting conversions) to cure the default. At your request, we will determine and provide a written improvement plan to assist your efforts to cure the default.

13

11.2  **Termination.**  We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Section 3.1, (2) you discontinue operating the Facility as a "Days Inn", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or License Agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

11.3  **Casualty and Condemnation.**

11.3.1  You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

11.3.2  You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.4  **Our Other Remedies.**  We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default. All Basic Service Charges accrue during the

14

suspension period. We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Service Interruption Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration. We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice. Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

11.5  **Your Remedies.** If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To the extent permitted by applicable law, this action shall be your exclusive remedy. We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

## 12.  Liquidated Damages.

12.1  **Generally.** If we terminate the License under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 30 days following the date of termination, as Liquidated Damages, an amount equal to the sum of accrued Royalties and Basic Service Charges during the immediately preceding 24 full calendar months (or the number of months remaining in the unexpired Term (the "Ending Period") at the date of termination, whichever is less). If the Facility has been open for fewer than 24 months, then the amount shall be the average monthly Royalties and Basic Service Charges since the Opening Date multiplied by 24. You will also pay any applicable Taxes assessed on such payment and Interest calculated under Section 7.3 accruing from 30 days after the date of termination. Before the Ending Period, Liquidated Damages will not be less than the product of $2,000 multiplied by the number of guest rooms you are then authorized to operate under Schedule B of this Agreement, as amended. If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable for termination under Section 11.2. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

12.2  **Condemnation Payments.** In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2, or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Royalties and Basic Service Charges for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year

DAYEXC1
216548  03/07

notice period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). You will pay no Liquidated Damages if the Condemnation is completed after the one year notice period expires, but you must pay the fees set forth in Section 7 when due until Condemnation is completed.

**13. Your Duties At and After Termination.** When the License or this Agreement terminates for any reason whatsoever:

13.1 **System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features. You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.

13.2 **Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a "Days Inn", including Basic Service Charges for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third parties that the Facility is no longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3 **Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4 **Survival of Certain Provisions.** Sections 3.8 (as to audits, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of the License and this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

**14. Your Representations and Warranties.** You expressly represent and warrant to us as follows:

16

**14.1    Quiet Enjoyment and Financing.**    You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

**14.2    This Transaction.**    You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. No executory franchise, license or affiliation agreement for the Facility exists other than this Agreement. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the License Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement. To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

**14.3    No Misrepresentations or Implied Covenants.**    All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

**15.    Proprietary Rights.**

**15.1    Marks and System.**    You will not acquire any interest in or right to use the System or Marks except under this Agreement. You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

**15.2    Inurements.**    All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part

17

of the System, and the associated good will, shall be our property and will inure to our benefit. No good will shall attach to any secondary designator that you use.

**15.3  Other Locations and Systems.**  We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory described in Section 17.8.  You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks.  We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

**15.4  Confidential Information.**  You will take all appropriate actions to preserve the confidentiality of all Confidential Information.  Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement.  You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software).  You will use Confidential Information only for the Facility and to perform under this Agreement.  Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended.  Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years.  We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

**15.5  Litigation.**  You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware.  We alone handle disputes with third parties concerning use of all or any part of the System.  You will cooperate with our efforts to resolve these disputes.  We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

**15.6  The Internet.**  You may use the Internet to market the Facility subject to this Agreement and System Standards.  You shall not use, license or register any domain name, universal

18

resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark without our consent. You will assign to us any such identification at our request without compensation or consideration. You must make available through the Reservation System and the Chain website all rates you offer to the general public via Internet marketing arrangements with third parties. You must participate in the Chain's best available rate on the Internet guarantee or successor program. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

## 16. Relationship of Parties.

**16.1 Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

**16.2 Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

## 17. Legal Matters.

**17.1 Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

**17.2 Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

19

17.3 **Notices.** Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, or, (iii) by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party (x) at its address stated below or as it may otherwise designate by notice, or (y) by such other means as to result in actual or constructive receipt by the person or office holder designated below. The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

Days Inns Worldwide, Inc.:
Our address: 1 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
Attention: Vice President-Franchise Administration; Fax No. (973) 496-5359

Your name: Golden Treasury II, LLC
Your address: 13416 Southeast 53rd St., Bellevue, WA 98006
Attention: Chong Yi; Your fax No.: _____

17.4 **Remedies.** Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

17.5 **Miscellaneous.** This Agreement is exclusively for the benefit of the parties. There are no third party beneficiaries. No agreement between us and anyone else is for your benefit. The section headings in this Agreement are for convenience of reference only.

17.6 **Choice of Law; Venue; Dispute Resolution.**

17.6.1 This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles. The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2 The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives. If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation. Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc. We will provide you with the contact address for that organization. The mediation will be conducted by a mutually acceptable and neutral third party. If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3 You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

DAYEXCI
216548 03/07

17.6.4  WAIVER OF JURY TRIAL.  THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE LICENSOR, THE LICENSEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.

17.7  Special Acknowledgments.  You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.

17.7.1  You received our UFOC for prospective licensees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us.  You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.

17.7.2  Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.

17.7.3  This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.

17.7.4  You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.

17.7.5  You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.

17.8  **Protected Territory**.  We will not own, operate, lease, manage, or license any party but you to operate a Chain Facility in the "Protected Territory", defined below, while this Agreement is in effect.  We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you.  We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory.  While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise (i) any guest lodging facility other than the Facility in the Protected Territory unless we or our affiliate licenses the facility, and/or (ii) any time share resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, for any facility or business that shares directly or indirectly, common areas, amenities, recreation facilities, services, supplies or support activities with the Facility.  You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities.  This Section does not apply to any Chain Facility located in

21

the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its license with us terminates or is not renewed.   The Protected Territory   fairly represents the Facility's trading area, and you acknowledge that.  There are no express or implied territorial rights or agreements between the parties except as stated in this Section.  By electing to include this section in your Agreement, you irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or occupancy of the Facility or decide whether to add the proposed Chain Facility to the Chain based on the potential effect of the proposed Chain Facility on the Facility or its performance. The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only.  The Protected Territory means an area within a circle created by a three (3) mile radius whose centerpoint is the front door of the Facility.

**18.   Special Stipulations.**   The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions.  You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties.  These are personal to you and are not transferable or assignable except to a Permitted Transferee.

18.1   **Your Additional Termination Right.** You may terminate the License without cause or penalty effective only on **June 30, 2014**  provided you give us at least six (6) months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination. You will pay no Liquidated Damages if you satisfy the conditions of the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores more than 200 points (or its then equivalent) on a quality assurance inspection and then fails to achieve a score less than 200 points (or its then equivalent) in a reinspection to be performed no sooner than 90 days after the initial inspection. You will not exercise this right if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless you first obtain SBA's consent.

18.1.0   **Our Additional Termination Right.**  We may terminate the License without cause or penalty effective only on **June 30, 2014** provided we give you at least six (6) months prior written notice of termination.   You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. We will not exercise this right if you notify us that the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless we first obtain SBA's consent.

22

18.2.  **Special Combined Fees.**  Notwithstanding Section 7.1, you will pay the "Combined Fee," consisting of the Royalty and the Basic Service Charge (excluding all Additional Charges such as commissions and related service charges, Internet fees, the Special Marketing Assessment, service fees and charges, guest reward and affinity program fees, guest complaint assessments, GDS Fees and similar fees and charges described in Schedule C), to us at the rates set forth in this Section, **provided that the Facility is in accordance with the deadlines specified in Section 3.1 of this Agreement:**

18.2.1  The Combined Fee shall be 6.8 percent (6.8%) of Gross Room Revenues accruing during the first License Year; and

18.2.2  The Royalty and Basic Service Charge shall be computed and paid at the rates specified in Section 7.1 on Gross Room Revenues accruing after the first License Year.

18.2.3  The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Combined Fee shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default, or (ii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of more than 200 (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of less than 200  in a reinspection to be performed not less than 60 days after the initial inspection.

Margaret yi

22A

IN WITNESS WHEREOF, the parties have executed this Agreement on this _28_ day of
_____6_, 20_07_ and agree to be bound by the terms and conditions of this Agreement as of the
Effective Date.


**WE:**
DAYS INNS WORLDWIDE, INC.:

By: _____          Attest: _____
        Vice President                        Assistant Secretary


**YOU**, as licensee:
GOLDEN TREASURY II, LLC

By: _____          Witness: _____
        Manager

**APPENDIX A**

DEFINITIONS

Agreement means this License Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their licensees when and if held.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Rules of Operation Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

DAYEXC1
216548 03/07

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Days Inn facilities located outside the United States, Canada and Mexico.

Effective Date means the date that you first take possession of the Facility, even if you sign this Agreement after the date you first take possession of the Facility.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Revenues means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use

25

taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Entry Charge means the fee you are to pay for gaining access to the Reservation System when you sign this Agreement and on the first and second anniversaries of the Effective Date under Section 6.2.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.1.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means:

(i) If the Opening Date occurs on the first day of a month: the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

(ii) If the Opening Date does not occur on the first day of a month: the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at 220 Brovo Terrace, Port Orchard, WA 98366, as more fully described in Schedule A.

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items

26

and design materials in Chain Facilities.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Days Inn" and other marks (U.S. Reg. Nos.: 1,160,430; 1,160,431; 1,420,612; 1,469,518; and 1,003,834) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Minor Renovation means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.16.

Minor Renovation Ceiling Amount means $3,000.00 per guest room.

Minor Renovation Notice means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.16.

Opening Date means the date as of which we authorize you to open the Facility for business identified by the Marks and using the System even if you sign this Agreement after that date. Unless we require that you close the Facility to perform any pre-opening Improvement Obligation, the Opening Date is the Effective Date.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Punch List means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, System Assessment Fees, Basic Service Charges, and other reservation fees and charges as stated in Section 7.

DAYEXCI
216548 03/07

Reinspection Fee means the fee you must pay to us under Section 3.9 if you do not complete your Punch List on time, fail any inspection or do not cooperate with our inspector or inspection System Standards.

Relicense Fee means the fee you are to pay for signing this Agreement as stated in Section 6. It also refers to the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

System Assessment Fees means the fees you pay to us under Section 7 and Schedule C for reservation services, including the Basic Service Charge and any other fees we charge for services provided by or through the Reservation System.

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7(a). "Royalties" means the aggregate of all amounts owed as a Royalty.

Service Interruption Fee means the fee you pay us when we suspend Central Reservation System service because you default under this Agreement, in the amount specified in Schedule C.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following: (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Standards means the standards for participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Operating Policies Manual, the Planning and Design Standards Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain

Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as licensee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Days Inns Worldwide, Inc., a Delaware corporation, its successors and assigns.

29

## SCHEDULE A

(Legal Description of Facility)

DAYEXC1
216548 03/07

LAND TITLE CO    200704250074
Deed Rec Fee: $ 35.00
04/20/2007 10:59 PM
Karen Flynn, Kitsap Co Auditor    Page: 1 of 4

WHEN RECORDED MAIL TO:

LAND TITLE CO    200704250312
Deed Rec Fee: $ 34.00
04/20/2007 03:26 PM
Karen Flynn, Kitsap Co Auditor    Page: 1 of 3

D. Benjamin Lee
400 112th Ave. NE, Ste. 340
Bellevue, WA 98004

217246
217674

## Statutory Warranty Deed

***RE-RECORD TO ATTACH EXHIBIT 'B'***

THE GRANTOR __AFK Corporation, a Washington Corporation,__ for and in consideration of __Ten Dollars ($10.00), IRC 1031 Exchange and other valuable consideration__ in hand paid, conveys and warrants to __Golden Treasury II, LLC, a Washington limited liability company,__ the following described real estate, situated in the County of __Kitsap,__ State of Washington:

TAX PARCEL NO: 5458-000-007-0009

FULL LEGAL: LOT 7, SOUTHEAST QUADRANT/SR16 INTERCHANGE, ACCORDING TO THE PLAT RECORDED IN VOLUME 31 OF PLATS, PAGES 78 THROUGH 80, INCLUSIVE, RECORDS OF KITSAP COUNTY, WASHINGTON

SUBJECT TO: Attached Exhibit A

Dated this __18th__ day of April 2007.

**EXCISE TAX EXEMPT** APR 26 2007

AFK Corporation

By: _____ (SEAL)
Hong Joon Kim, its President

KITSAP COUNTY TREASURER EXCISE
2007EX02984    04/25/2007
Total : $71295.00

Clerk's Initial _____

STATE OF WASHINGTON )
                     ) ss.
County of King       )

On this __18th__ day of April, 2007, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared Hong Joon Kim, the President of AFK Corporation, and acknowledged the said instrument to be the Corporation's free and voluntary act and deed, for uses and purposes therein mentioned.

Witness my hand and official seal hereto affixed that day and year first above written.

_____
NOTARY PUBLIC in and for the
State of Washington, residing
at __Seattle__
My Commission Expires: __07-03-10__

SUN KYUNG LYOU
COMMISSION EXPIRES
NOTARY PUBLIC
07-03-10
STATE OF WASHINGTON

# SCHEDULE B

**PART I:**    YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest |
|------|----------------------|-------------------------|
| **Chong S. Yi** | **50.00%** | **Member** |
| **Margaret YI** | **50.00%** | **Member** |

**PART II:**    THE FACILITY:

Primary designation of Facility: <u>Days Inn</u>

Number of approved guest rooms: <u>55</u>.

Parking facilities (number of spaces, description): <u>60</u>.

Other amenities, services and facilities: <u>2 floors with interior corridors and a indoor pool</u>.

**PART III:**    DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE COMPLETED AS THE IMPROVEMENT OBLIGATION:

**[Punch List to be attached.]**

Initial

DAYEXC1
216548 03/07

# DAYS INNS WORLDWIDE, INC.
# SCHEDULE C

## January 2007

A.    System Assessment Fees

The System Assessment Fee includes the Basic Service Charge equal to 3.8% of Gross Room Revenues. We reserve the right to increase or modify the Basic Service Charge and any Additional Charges for all Chain Facilities in the United States and to add other fees and charges for new services, at our sole discretion as to amount or formula from time to time but with at least 30 days prior written notice and after consultation with the Board of Directors of the Days Inns Franchisee Advisory Association, and to add, drop or modify the types of services offered.

B.    Mandatory Marketing Program Charge

We charge a Mandatory Marketing Program Charge for your participation in the TripRewards® or successor guest loyalty program. Under TripRewards, program members staying at qualifying rates at Chain Facilities earn their choice of TripRewards points, airline miles or other program currency. TripRewards points are redeemable for free stays at Chain Facilities and for travel, merchandise, entertainment and other awards. The Mandatory Marketing Program Charge is up to 5% of the Gross Room Revenues accruing from each qualifying stay at the Facility. We will proactively match and award members with points or other program currency they earn on qualified stays even if they do not present their TripRewards membership card upon check-in. You will be billed monthly in arrears for qualifying stays by program members during the preceding month.

C.    GDS and Internet Booking Fees

We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee for reservations processed through the global distribution systems ("GDS") or the Internet for your Facility. The GDS Fee described in Section 7 is $5.15 per reservation processed through any GDS or through any Internet website powered by a GDS. Internet-originated reservations carry fees of $4.15 per reservation booked through sources other than GDS powered websites, our Chain website, or our direct connection to expedia.com or hotels.com. We do not charge any fees for reservations booked through our Chain website or through our direct connection to expedia.com or hotels.com, our Chain website. GDS and Internet-originated reservations also carry a commission if the originator qualifies. If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable fee.

D.    Additional System Assessment or Reservation System Charges

Agency and other commissions are typically 10% of the Gross Room Revenues generated by each reservation booked by an agency or other qualifying originator. Agencies which are part of a travel consortium or a travel management company, including our affiliates, may charge

DAYEXCI
216548 03/07

additional commissions of up to 5% and/or participation fees to be included in their programs. We may raise the agency commission to up to 15% of Gross Room Revenues from time to time for certain Chain-wide promotions upon 20 days advance written notice. Such increases will apply only to reservations booked after we announce the increased commission unless we specify otherwise. The general sales agent commission (also known as the international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the agency commission.

We may assess you for additional fees or commissions charged us by distribution channels, travel intermediaries and retailers or for performing other services. By accepting reservations from the GDS, Internet, travel agencies and other intermediaries, you agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to them on your behalf or for Chain Facilities to participate in their programs.

If we suspend Central Reservation System service because of your default under this Agreement, then you must pay us a Service Interruption Fee of $200 before we restore service.

You must (i) make available through the Central Reservation System and the Chain website room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. Beginning May 1, 2004 if a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through the Chain website or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the first room night to the guest without a room charge. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $25 to reimburse us for our administrative charges of handling the complaint.

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties including our affiliates. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. For providing and managing this activity we may receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. We will allocate these commissions to Royalties and Basic Service Charges in equal proportions. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights.

The "property to property" incentive sales commission is 5% of the Gross Room Revenues generated from each reservation originated by another Chain Facility through the Central Reservation System. You will receive an incentive commission equal to 5% of the Gross Room

33

Revenues generated by a reservation originated through the Facility's Reservation System terminal. We may establish rules and procedures for this program in the Manuals. Your incentive commissions are payable monthly in arrears. We may use your incentive commission payments to offset amounts you owe us for Recurring Fees and other charges, or owe our Affiliates for other fees and charges.

We or an affiliate may charge you a commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of affinity groups and organizations participating in our Member Benefits sales program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members.

E.     *Guest Services Assessment*

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. If you do not respond to any complaint within 7 business days after we refer it to you and the guest contacts us again to seek resolution, we will charge you a "Guest Services Assessment" of $75.00, plus the costs we incur to settle the matter with the guest. In addition, if the number of guest complaints per 1,000 occupied roomnights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish with the approval of the Board of Directors of the Days Inn Franchise Advisory Association, Inc., we will charge you a "Processing Fee" of $25.00 for each additional complaint we receive during that year, regardless of whether you are able to resolve it to the guest's satisfaction. We may change or eliminate the Guest Services Assessment, the Processing Fee, the Annual Facility Allotment and/or the time for responding to or resolving a guest complaint on a Chain-wide basis at any time upon 30 days advance notice, with the approval of the Board. The Guest Services Assessment and the Processing Fee are intended only to reimburse us for the costs of complaint handling and are not intended as penalties or liquidated damages. All guest complaints remain subject to indemnification under this Agreement.

DAYEXC1
216548  03/07

## GUARANTY

To induce Days Inns Worldwide, Inc., its successors and assigns ("you") to sign the License Agreement (the "Agreement") with the party named as the "Licensee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Licensee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Licensee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Licensee and notice from you we will immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of Licensee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Licensee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

WITNESSES:                           GUARANTORS:

_Andy Kim_                           _U Chug Dan_ (Seal)
                                     Chong S. Yi

_Yeung Lim_                          _Margaret Yi_ (Seal)
                                     Margaret Yi

35

DAYEXC1
216548 03/07

# EXHIBIT B

DocuSign Envelope ID: B6669BCA-EF5B-4B1B-8A60-5F3ADCB196F6

Location:  PORT ORCHARD, WA
Site No.:  14080
Entity No.: 70637

### SynXis Subscription Agreement

This SynXis Subscription Agreement ("**Agreement**"), effective as of ___September_____ __24_, 2015 (the "**Effective Date**"), by and between Days Inns Worldwide, Inc - Delaware corporation ,
("**Franchisor**"), and Golden Treasury II, LLC                                    ("**Franchisee**"), governs Franchisee's access to and use of the SaaS Solution and Services as described herein. Franchisor and Franchisee shall each be referred to herein as a "**Party**" and together as the "**Parties**" to this Agreement.

For and in consideration of the mutual covenants, representations and promises hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree to the foregoing and as follows:

**1.    GENERAL**

**1.1    Definitions.**  Capitalized terms used herein shall have the meanings ascribed to them in this Agreement or in any Schedules attached hereto, which may be updated or supplemented by Franchisor from time to time, or as defined in Schedule 1.1.  All other capitalized terms used but not defined herein shall have the meanings ascribed to them in the Franchise Agreement and are incorporated herein by reference.

**1.2    Conflicts in Interpretation.**  The following order of precedence shall be followed in resolving any inconsistencies between the terms of this Agreement and the terms of any Schedules attached hereto: (a) first, the terms contained in the body of this Agreement; and (b) second, the terms of the Schedules attached to this Agreement, provided that no order of precedence shall be applied among such Schedules.

**2.    DESCRIPTION OF SAAS SOLUTION**

**2.1    The SaaS Solution.**  The "**SaaS Solution**" means the computer program, applications, features and services expressly identified on Schedule 2.1 and any and all modifications, corrections, updates and enhancements to such SaaS Solution, including any Franchisor may from time to time make available to Franchisee.  The SaaS Solution does not include any Non-SaaS Solution Services as specified in Section 7.

**2.2    Elavon Hosting Services Agreement.**  In order to access and use the SaaS Solution pursuant to this Agreement, on or before ten (10) days following the Effective Date, Franchisee shall execute that certain Hosted Services Agreement for Hosted Gateway Services directly with Elavon Inc., or a substantially similar agreement with an alternate vendor designated by Franchisor, ("**Elavon Agreement**").  The Elavon Agreement exclusively covers the offering provided thereunder (the "**Elavon Non-SaaS Solution Services**").

**2.3    Implementation Services.**  On a date after which Franchisee has signed both the Elavon Agreement and this Agreement, Franchisor shall use reasonable efforts to implement the SaaS Solution as described in Schedule 2.3 attached hereto (the "**Implementation Services**") and Franchisee shall follow all of Franchisor's instructions for preparing the Facility, at Franchisee's sole expense, for implementation of the SaaS Solution.  The SaaS Solution shall be deemed accepted by Franchisee ("**Acceptance**") immediately upon implementation of the SaaS Solution by Franchisor (the "**Acceptance Date**").

DocuSign Envelope ID: B6669BCA-EF5B-4B1B-8A60-5F3ADCB196F6

**3.     GRANT OF RIGHTS**

      **3.1     License.**  Subject to payment of all applicable fees, Franchisor hereby grants to Franchisee a limited, non-transferable, non-exclusive license, to access, use and display the SaaS Solution during the Term solely for the Permitted Use and solely by End Users in accordance with the terms and conditions set forth in this Agreement.

      **3.2     Limitations.**  Except as provided in Section 3.1, all rights, title and interests in and to the SaaS Solution are reserved to Franchisor or to any Third Party who licenses the SaaS Solution to Franchisor or to Franchisor's Affiliates.

      **3.3     Title.**  Title to and ownership of the SaaS Solution, including all Intellectual Property rights therein, is and shall remain with Franchisor, its Affiliates or any Third Party who licenses it to Franchisor. Franchisee shall at all times protect and defend, at Franchisee's own cost and expense, Franchisor's rights, title and interests in and to the SaaS Solution against all claims, liens and legal processes of Franchisee's creditors.

      **3.4     Restrictions.**  Franchisee shall not: (a) permit any unauthorized Third Party to access or use the SaaS Solution; (b) create or attempt to create any derivate works based on the SaaS Solution; (c) copy, frame or mirror any part or content of the SaaS Solution; (d) disassemble, decompile, reverse engineer or otherwise attempt to recreate the SaaS Solution; or (e) access, use or otherwise manipulate the SaaS Solution in order to create a competitive product or service or to copy any features, functions or graphics of the SaaS Solution. Franchisor may, at its sole discretion and without prior notice to Franchisee, conduct audits of Franchisee's Hardware, computer systems and applications, including audits by electronic and remote means, to verify conformance with this Agreement.

      **3.5     Suggestions.**  Any suggestions and feedback relating to the SaaS Solution or Services or relating to any desired or recommended additional features, enhancements or modifications to the SaaS Solution or Services that are provided by or through Franchisee or its Affiliates to Franchisor shall be the exclusive property of Franchisor as of the date it is offered to Franchisor and Franchisee and its Affiliates hereby assign all rights and interests in and to such suggestions and feedback to Franchisor as of the date it is offered to Franchisor.

**4.     SERVICES**

      **4.1     Additional Services.**  Franchisor may perform additional services agreed to in writing by the parties from time to time, which may include additional fees to be agreed to by the Parties (the "**Additional Services**").

      **4.2     Revenue Management Services.**  From time to time, Franchisor may provide services to Franchisee under Franchisor's Central Rate and Inventory Support Program (the "**CRISP Services**") consistent with Schedule 4.2 attached hereto, which may be updated or supplemented by Franchisor from time to time.

      **4.3     Maintenance and Support Services.**  Subject to Franchisee performing all Franchisee Responsibilities identified in Schedule 4.3 ("**Franchisee Responsibilities**"), Franchisor shall provide maintenance and support services as set forth on Schedule 4.3 attached hereto ("**Maintenance and Support Services**").

      **4.4     Access Credentials.**  Franchisor, directly or indirectly, shall provide Access Credentials to Franchisee. Franchisor may, from time to time and in its sole discretion, change or require Franchisee to change Franchisee's Access Credentials. Franchisee must follow all security procedures and

DocuSign Envelope ID: B6669BCA-EF5B-4B1B-8A60-5F3ADCB196F6

protocols that Franchisor may from time to time establish or modify. Franchisee shall not permit the SaaS Solution to be accessed in violation of the security procedures and protocols as set forth herein. Franchisee shall safeguard any Access Credentials that Franchisor provides to Franchisee as a trade secret, and shall reveal such information only to its End Users on a need to know basis. Franchisee shall immediately inform Franchisor if Franchisee has knowledge or a reasonable basis to believe that its Access Credentials have been lost, stolen, misappropriated or compromised in any way or manner, and Franchisee shall strictly follow Franchisor's instructions regarding any replacement Access Credentials. Franchisee shall be responsible for all access or use through its Access Credentials.

**4.5    Permitted Uses.**  Franchisee shall use the SaaS Solution only for the Permitted Uses with respect to the business and operations of Franchisee as contemplated in the Franchise Agreement. Franchisee shall not load, store or otherwise use any software on or with the SaaS Solution, without Franchisor's prior written consent, as the use of such software may adversely affect the operation and functionality of the SaaS Solution and the Services. If Franchisee violates this Section, the warranties set forth in this Agreement shall be void, and Franchisee shall be solely responsible for the cost of repair or replacement of the SaaS Solution, if any.

**4.6    Franchisor's Responsibilities.**  Franchisor shall: (a) use commercially reasonable efforts to make the SaaS Solution available twenty-four (24) hours a day, seven (7) days a week, except for: (i) planned downtime, or (ii) any unavailability caused by circumstances beyond Franchisor's reasonable control, including without limitation, acts of nature, acts of government, floods, fires, earthquakes, civil unrest, acts of terror, labor strikes, Internet service provider failures or delays, or denial of service attacks; and (b) provide the SaaS Solution only in accordance with applicable laws and government regulations that govern the implementation of the SaaS Solution.

**4.7    Franchisee's Responsibilities.**  Franchisee shall: (a) be fully responsible for its End Users' compliance with this Agreement; (b) be responsible for the accuracy, quality and legality of Guest Information, to the extent collected by Franchisee or its employees, agents or representatives, and for the means by which Franchisee or its employees, agents or representatives acquires Guest Information; (c) prevent unauthorized access to or use of the SaaS Solution, and notify Franchisor promptly of any such unauthorized access or use; and (d) use the SaaS Solution only in accordance with this Agreement and applicable laws and government regulations. Franchisee shall not: (i) make the SaaS Solution available to anyone other than authorized End Users; (ii) sell, resell, rent or lease the SaaS Solution; (iii) use the SaaS Solution to store or transmit infringing, libelous, or otherwise unlawful or tortious material, or to store or transmit material in violation of the privacy rights of any Third Party; (iv) use the SaaS Solution to store or transmit software viruses, malicious code or other harmful files; (v) interfere with or disrupt the integrity or performance of the SaaS Solution or the data of any Third Party contained therein; or (vi) attempt to gain unauthorized access to the SaaS Solution or any related networks.

## 5.    FEES AND PAYMENTS

**5.1    Fees.**  Franchisee shall pay all fee amounts specified in <u>Schedule 5.1</u> to this Agreement for the SaaS Solution and the Services ("**Fees**"), for at least the period beginning on the Acceptance Date through the end of the Commitment Period and continuing for the duration of the Term.    If Franchisee's franchise involves the transfer of an existing Chain Facility to Franchisee or changing affiliation of the Facility from one Wyndham Hotel Group-owned franchise system to another, Franchisee will be charged a transfer fee ("**Transfer Fee**"). Franchisee may also request additional training services, which Franchisor may provide to Franchisee for an additional fee. Franchisor may charge an additional fee for services under Section 5.4, if acceleration is at Franchisee's request.

**5.2    Payments.**  Franchisor may apply any amounts received to any outstanding invoices in any order. If Franchisee does not make all payments of Fees to Franchisor when due, then, upon written notice to Franchisee, Franchisor may withhold implementation, suspend the SaaS Solution (subject to

DocuSign Envelope ID: B6669BCA-EF5B-4B1B-8A60-5F3ADCB196F6

Section 5.4 below) or terminate this Agreement. All amounts due hereunder are due upon receipt of the invoice. Franchisor may increase the ongoing Fees on an annual basis by no more than five percent (5%) above the fees paid by Franchisee during the immediately preceding twelve (12) month period; provided, however, that Franchisor shall notify Franchisee no less than thirty (30) days prior to any such increase taking effect. In the event that a Commitment Period applies, Franchisor will not increase such Fees during the Commitment Period.

**5.3    Overdue Charges.**  If any charges are not received from Franchisee by the due date, then, at Franchisor's sole discretion, (a) such charges may accrue late interest at the rate of 1.5% of the outstanding balance per month, or the maximum rate permitted by law, whichever is lower, from the date such payment was due until the date paid, and/or (b) Franchisor may condition future subscription renewals on payment terms shorter than those specified in Section 5.1 above (Fees).

**5.4    Suspension of Service and Acceleration.**  If any Fees owing by Franchisee under this Agreement for the SaaS Solution and Services is thirty (30) or more days overdue, Franchisor may, without limiting any other rights and remedies it may have, accelerate Franchisee's unpaid fee obligations under this Agreement so that all such obligations become immediately due and payable, and suspend the SaaS Solution and Services to Franchisee until such amounts are paid in full. Franchisor shall give Franchisee at least seven (7) days' prior written notice that Franchisee's account is overdue, in accordance with Section 17.1 (Notices), before suspending the SaaS Solution and Services to Franchisee.

**5.5    Taxes.**  Unless otherwise stated, Franchisor's Fees do not include any taxes, levies, duties or similar governmental assessments of any nature, including but not limited to value-added, sales, use or withholding taxes, assessable by any local, state, provincial, federal or foreign jurisdiction (collectively, "**Taxes**"). Franchisee is responsible for paying all Taxes associated with its purchases hereunder. If Franchisor has the legal obligation to pay or collect Taxes for which Franchisee is responsible under this section, the appropriate amount shall be invoiced to and paid by Franchisee, unless Franchisee provides Franchisor with a valid tax exemption certificate authorized by the appropriate taxing authority. For clarity, Franchisor is solely responsible for taxes assessable based on Franchisor's income, property and employees.

## 6.    <u>TECHNICAL SPECIFICATION REQUIREMENTS</u>

**6.1    Minimum Technical Requirements.**  To access and use the SaaS Solution, Franchisee must use Hardware and subscribe to Communication Services that meet Franchisor's technical specification requirements set forth on <u>Schedule 6.1</u>. If any service provider(s) (including without limitation, any service provider made available by Franchisor), at Franchisee's request, attempts to integrate Hardware with the SaaS Solution or Services, Franchisor shall not be liable for any injury or damage to either the Hardware or the SaaS Solution unless such injury or damage is due to Franchisor's gross negligence or willful misconduct. For the avoidance of doubt, the warranties and support described in this Agreement do not apply to any Hardware or Communication Services.

## 7.    <u>NON-SAAS SOLUTION SERVICES PROVIDERS</u>

**7.1    Acquisition of Non-SaaS Solution Services.**  Franchisor or a Third Party may from time to time make available to Franchisee offerings designed to interoperate with the SaaS Solution ("**Non-SaaS Solution Services**"). Any acquisition by Franchisee of such Non-SaaS Solution Services, and any exchange of data between Franchisee and any Non-SaaS Solution Services provider, is solely between Franchisee and the Third Party that provides the applicable Non-SaaS Solution Services.

**7.2    No Representation or Warranty.**  Franchisor does not warrant or support any Non-SaaS Solution Services. Any Non-SaaS Solution Services shall be governed exclusively by any agreement entered into between Franchisee and the Third Party that offers the applicable Non-SaaS Solution

DocuSign Envelope ID: B6669BCA-EF5B-4B1B-8A60-5F3ADCB196F6

Services. If the provider of any Non-SaaS Solution Services ceases to make such Non-SaaS Solution Services available for interoperation with the SaaS Solution on reasonable terms, Franchisor may, in its sole discretion, cease providing access to such Non-SaaS Solution Services without entitling Franchisee to any refund, credit, or other compensation.

## 8.    CONFIDENTIALITY

**8.1    Definition of Confidential Information.**  As used herein, "**Confidential Information**" means all confidential information disclosed by a Party ("**Disclosing Party**") to the other Party ("**Receiving Party**"), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of disclosure. Franchisor's Confidential Information shall include the SaaS Solution and Services. Confidential Information of each Party shall include the terms and conditions of this Agreement, as well as business and marketing plans, technology and technical information, product plans and designs, and business processes disclosed by such Party. However, Confidential Information shall not include any information that: (a) is or becomes generally known to the public without breach of any obligation owed to the Disclosing Party; (b) was known to the Receiving Party prior to its disclosure by the Disclosing Party without breach of any obligation owed to the Disclosing Party; (c) is received from a Third Party without breach of any obligation owed to the Disclosing Party; or (d) was independently developed by the Receiving Party.

**8.2    Protection of Confidential Information.**  The Receiving Party shall: (a) use the same degree of care that it uses to protect the confidentiality of its own confidential information of like kind (but in no event less than reasonable care); (b) not use any Confidential Information of the Disclosing Party for any purpose outside the scope of this Agreement; and (c) except as otherwise authorized by the Disclosing Party in writing, limit access to Confidential Information of the Disclosing Party to those of its and its Affiliates' employees, contractors and agents who need such access for purposes consistent with this Agreement and who have signed confidentiality agreements with the Receiving Party containing protections no less stringent than those herein. Neither Party shall disclose the terms of this Agreement to any Third Party other than its Affiliates and their legal counsel and accountants without the other Party's prior written consent.

**8.3    Compelled Disclosure.**  The Receiving Party may disclose Confidential Information of the Disclosing Party if it is compelled by law to do so, provided the Receiving Party gives the Disclosing Party prior notice of such compelled disclosure (to the extent legally permitted) and reasonable assistance, at the Disclosing Party's cost, if the Disclosing Party wishes to contest the disclosure. If the Receiving Party is compelled by law to disclose the Disclosing Party's Confidential Information as part of a civil proceeding to which the Disclosing Party is a party, and the Disclosing Party is not contesting the disclosure, the Disclosing Party will reimburse the Receiving Party for its reasonable cost of compiling and providing secure access to such Confidential Information.

## 9.    DATA PRIVACY

**9.1    Data Policies.**  Franchisee shall comply with and abide by Franchisor's data policies and procedures which Franchisor may, at its sole discretion and without prior notice, update from time to time (the "**Data Policies**"). If there is a conflict between the Data Policies and applicable law, Franchisee should comply with applicable law and immediately notify Franchisor in writing of such conflict.

**9.2    Guest Information.**  Franchisor and/or its Affiliate shall own all Guest Information that is within the possession of Franchisor and/or Franchisor's Affiliate or any service provider holding such information on Franchisor's or a Franchisor Affiliate's behalf, and Franchisee shall own all Guest Information that is within the possession of Franchisee or any Franchisee service provider holding such information on Franchisee's behalf. To the extent that Franchisor (including its Affiliates) and

DocuSign Envelope ID: B6669BCA-EF5B-4B1B-8A60-5F3ADCB196F6

Franchisee both possess identical Guest Information, Franchisor's (including its Affiliates') and Franchisee's respective ownership rights with regard to such Guest Information shall be separate and independent from one another. Franchisee acknowledges and agrees that: (a) Franchisee shall take all commercially reasonable steps to assure the timely and accurate collection, recording, processing and transmittal of the Guest Information to the SaaS Solution at all times; and (b) with respect to Franchisee's use of the Guest Information, Franchisee shall comply with all applicable laws, Franchisor's Data Policies and any contract or promise Franchisee makes with or to any of its guests.

**9.3    Non-Owned Information.** Other than the Guest Information, Franchisee shall not use any information it obtains from the SaaS Solution, including but not limited to any information that Franchisor appends to the Guest Information ("**Non-Owned Information**"), for the benefit of any business, enterprise or activity other than the business of the Facility, and in accordance with all applicable laws and Franchisor's Data Policies. Franchisee shall not disclose, copy, assign, transfer, lease, rent, sell, donate, disseminate or otherwise commercialize any Non-Owned Information for any other purpose without Franchisor's prior written consent, which Franchisor may withhold at its sole discretion.

**9.4    Dummy Information.** Any information provided to Franchisee from the SaaS Solution may contain "dummy" information, special codes or other devices to assure compliance with this Agreement and monitor possible unauthorized use of SaaS Solution. Franchisee shall be conclusively presumed to have violated this Agreement if Franchisor discovers any unauthorized mail or contacts from information provided only to Franchisee or the Facility.

**9.5    Improper Access.** If Franchisee should obtain access to Non-Owned Information in violation of the Data Policies or this Agreement, Franchisee shall be a trustee of that information and must act in a fiduciary capacity to protect the information from further unauthorized use or disclosure, and take all commercially reasonable efforts to return the information to Franchisor as soon as possible.

## 10.    WARRANTY AND SUPPORT

**10.1    General.** Franchisor warrants that following the Acceptance Date and for a period of sixty (60) days thereafter, the SaaS Solution will perform the functions and operations in a good workmanlike manner provided that Franchisee: (a) follows Franchisor's instructions, updates and modifications; (b) makes corrections, as directed; (c) pays all applicable Fees when due; and (d) is not otherwise in default under this Agreement or the Franchise Agreement. Franchisor's sole obligation under this warranty shall be to use reasonable efforts to remedy any nonperformance of the SaaS Solution within a reasonable time after Franchisee reports such nonperformance to Franchisor.

**10.2    Intellectual Property.** Franchisor has the right to provide Franchisee with the rights granted hereunder, and, to the best of Franchisor's knowledge, the SaaS Solution does not infringe any Intellectual Property rights of any Third Party.

**10.3    Support.** Franchisor or its Affiliates will provide a toll-free telephone number for reporting any nonperformance of the SaaS Solution, and Franchisor or its Affiliates will use reasonable efforts to diagnose and remedy such nonperformance within a reasonable time after Franchisee reports such nonperformance to Franchisor. Franchisee must perform all user-required maintenance specified by the vendor of any Hardware or Communication Services, and obtain required maintenance only from an authorized service provider.

**10.4    DISCLAIMER.** THE ABOVE WARRANTIES SHALL BE RENDERED NULL AND VOID IF THE SAAS SOLUTION IS SUBJECTED TO ABUSE, MISUSE, IMPROPER INSTALLATION AT THE FACILITY OR MAINTENANCE BY UNAUTHORIZED SERVICE PERSONNEL, OR IF THE SAAS SOLUTION IS ALTERED WITHOUT FRANCHISOR'S EXPRESS CONSENT OR DIRECTION, OR USED FOR A PURPOSE NOT AUTHORIZED UNDER THIS AGREEMENT,

DocuSign Envelope ID: B6669BCA-EF5B-4B1B-8A60-5F3ADCB196F6

OR IF THE SAAS SOLUTION IS DAMAGED OR DESTROYED DUE TO ACTS OF NATURE, WAR, TERRORISM, CIVIL UNREST, FIRES, NATURAL DISASTERS, OR OTHER EVENTS BEYOND FRANCHISOR'S CONTROL. EXCEPT AS PROVIDED IN THIS SECTION 10, FRANCHISOR MAKES NO WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY WARRANTY ABOUT THE SAAS SOLUTION OR ANY SERVICES, THEIR MERCHANTABILITY OR THEIR FITNESS FOR ANY PARTICULAR PURPOSE. FRANCHISOR MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER REGARDING THE VOLUME OF RESERVATIONS OR AMOUNT OF REVENUES THAT THE FACILITY MAY ATTAIN THROUGH THE USE OF THE SAAS SOLUTION OR IN CONNECTION WITH THE RECEIPT OF ANY SERVICES OR THAT FRANCHISEE'S RESERVATIONS OR REVENUE WILL INCREASE. FRANCHISEE, ON BEHALF OF ITSELF, ITS SUCCESSORS AND ASSIGNS, HEREBY WAIVES, RELEASES AND RENOUNCES ANY AND ALL CLAIMS OR CAUSES OF ACTION IT MAY HAVE AGAINST FRANCHISOR, FRANCHISOR'S AFFILIATES, OR FRANCHISOR'S OR THEIR OFFICERS, DIRECTORS OR AGENTS, ARISING OUT OF THE SAAS SOLUTION, UNLESS DUE TO FRANCHISOR'S WILLFUL MISCONDUCT.

## 11. INDEMNIFICATION

**11.1 Indemnification.** Franchisee shall indemnify, defend and hold harmless Franchisor, Franchisor's Affiliates, its licensors and their successors and assigns and each of the respective directors, officers and employees associated with them against all claims, actions or proceedings, arising out of or related to Franchisee's operation, use or non-use of the SaaS Solution, including any use of the Guest Information or any Third Party data or system security breaches and any Non-SaaS Solution Services or agreements therefor. Franchisor shall not be liable to Franchisee or any Third Party for personal injury or property loss, including but not limited to, damage to the Facility, as a result of Franchisee's operation, use or non-use of the SaaS Solution, Franchisee's receipt of Services hereunder, and/or any Third Party data or system security breaches or any Non-SaaS Solution Services or agreements therefor. Franchisee is not obligated to indemnify Franchisor for Franchisor's own gross negligence or intentional misconduct arising out of the operation, use or non-use of the SaaS Solution.

## 12. NO LIABILITY FOR INFORMATION

**12.1 No Liability.** FRANCHISOR SHALL NOT BE LIABLE FOR ANY CLAIMS OR DAMAGES RESULTING FROM ANY INCORRECT INFORMATION GIVEN TO FRANCHISOR OR INPUT INTO THE SAAS SOLUTION BY ANY PERSON THAT IS NOT FRANCHISOR. SUPPORT OR SERVICES HEREUNDER NECESSITATED BY COMPUTER VIRUSES, OR BY ANY FAILURE OR BREACH OF FRANCHISEE'S SECURITY FOR ITS SYSTEMS OR DATA, INCLUDING, WITHOUT LIMITATION, DAMAGE CAUSED BY PERSONS LACKING AUTHORIZED ACCESS, ARE NOT COVERED UNDER THIS AGREEMENT. FRANCHISEE WAIVES ANY CLAIMS HEREUNDER AGAINST FRANCHISOR TO THE EXTENT ARISING FROM FRANCHISEE'S FAILURE TO HAVE OR MAINTAIN CURRENT VIRUS PROTECTION, OR TO THE EXTENT ARISING FROM A FAILURE OR BREACH OF FRANCHISEE'S SECURITY FOR ITS SYSTEMS OR DATA, OR AS A RESULT OF ANY UNAUTHORIZED ACCESS TO FRANCHISEE'S SYSTEMS.

## 13. DAMAGE LIMITATION

**13.1** NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, NEITHER FRANCHISOR NOR FRANCHISOR'S AFFILIATES SHALL BE LIABLE TO FRANCHISEE FOR SPECIAL, CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY, OR INDIRECT DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS OR LOST REVENUE (COLLECTIVELY REFERRED TO AS **"INDIRECT DAMAGES"**) IN

CONNECTION WITH THE SAAS SOLUTION OR THIS AGREEMENT, EVEN IF FRANCHISOR HAD BEEN ADVISED OF THE POSSIBILITY OF OR COULD HAVE REASONABLY FORESEEN SUCH DAMAGES. IN ADDITION, NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, FOR DIRECT DAMAGES CAUSED BY FRANCHISOR (AND ANY INDIRECT DAMAGES TO THE EXTENT THAT THE ABOVE LIMITATION IS NOT RECOGNIZED BY A COURT OR OTHER AUTHORITY) ANY CLAIM SHALL BE LIMITED TO THE TOTAL AMOUNT PREVIOUSLY PAID BY FRANCHISEE TO FRANCHISOR FOR THE PREVIOUS TWELVE (12) MONTH PERIOD. THE ABOVE LIMITATIONS ON LIABILITY APPLY REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT, OR OTHERWISE.

## 14.   TERM AND TERMINATION

**14.1   Term.**  This Agreement shall be effective as of the Effective Date and shall continue in full force and effect until termination of the Franchise Agreement, unless earlier terminated in accordance with the terms and conditions of this Agreement ("**Term**").

**14.2   Breach.**  If any one of the following events occurs, then to the extent permitted by applicable law, Franchisor shall have the right to immediately terminate this Agreement: (a) Franchisee fails to make any payment when due under this Agreement or the Franchise Agreement and such failure continues uncured for a period of thirty (30) days (provided that Franchisor shall provide Franchisee with at least seven (7) days' prior notice of such overdue amount); (b) Franchisee violates the privacy, security or confidentiality obligations set forth in this Agreement; (c) Franchisee breaches any other covenant, warranty or agreement under this Agreement, the Franchise Agreement or any other agreement between Franchisee and Franchisor or Franchisor's Affiliate and such failure continues uncured for a period of thirty (30) days after Franchisee is given written notice of such failure; (d) the SaaS Solution becomes inoperable by Franchisee's act or omission; or (e) Franchisee's Franchise Agreement expires or terminates for any reason.

**14.3   Suspension.**  In addition to the right to terminate this Agreement, Franchisor may suspend Franchisee's access to the SaaS Solution upon the occurrence of any of the events described in Section 14.2 until Franchisee's violation is cured and Franchisee has agreed in writing to engage in no conduct that will cause a repeat violation to occur. If Franchisee violates such a restoration agreement, Franchisor may suspend or terminate Franchisee's access to the SaaS Solution permanently or for an indefinite period. Because Franchisor still incurs costs on Franchisee's behalf, Franchisee must continue to pay all fees associated with services under the Franchise Agreement during any such suspension period.

**14.4   Termination For Convenience By Franchisee.**   Following the Commitment Period, Franchisee may terminate this Agreement for convenience at any time by providing Franchisor with not less than sixty (60) days' advance written notice.

**14.5   Termination For Convenience By Franchisor.**  Franchisor may terminate this Agreement for convenience at any time provided that: (a) Franchisor shall provide Franchisee with no less than six (6) months' advance notice; and (b) if the effective date of such termination occurs during the Commitment Period, Franchisee will not be required to pay for the SaaS Solution and Services that it has not yet used or received for the remainder of the Commitment Period.

**14.6   Upon Termination.**  Upon termination of this Agreement: (a) Franchisee's license granted under this Agreement ends and Franchisee shall immediately cease using the SaaS Solution; (b) Franchisee shall immediately cease using the Access Credentials that Franchisee was provided to access and use the SaaS Solution; and (c) Franchisee shall return the originals and all copies of non-owned Guest Information and other Confidential Information unencumbered to Franchisor within thirty (30) days after termination and certify to Franchisor in writing that the original and all copies have been

DocuSign Envelope ID: B6669BCA-EF5B-4B1B-8A60-5F3ADCB196F6

returned. FRANCHISEE EXPRESSLY WAIVES ANY RIGHT TO NOTICE OF OR ANY HEARING WITH RESPECT TO REPOSSESSION AND CONSENT TO ENTRY INTO THE FACILITY BY FRANCHISOR'S AGENTS OR REPRESENTATIVES OR ANY PREMISES WHERE THE SAAS SOLUTION MAY BE LOCATED AND REMOVING IT WITHOUT JUDICIAL PROCESS. If Franchisee fails or refuses to permit the peaceable entry by Franchisor's agents to take possession of the SaaS Solution, Franchisee shall be liable for rental of the SaaS Solution at the rate of $500.00 per week from the date that Franchisor first attempts to retake the SaaS Solution. Franchisor may, in its sole discretion, embed within the SaaS Solution various security devices that will render the SaaS Solution unusable and the data stored by the Hardware or the SaaS Solution inaccessible if this Agreement terminates.

## 15. NOTICES

**15.1 General.** All notices and other communications in connection with this Agreement shall be in writing and shall be sent to the respective Parties at the addresses set forth below or to such other addresses as may be designated by each Party in writing from time to time in accordance with this section. All notices and other communications shall be sent by registered or certified air mail, postage prepaid, or by express courier service, service fee prepaid. All notices and other communications shall be deemed received: (a) immediately upon delivery, if hand delivered; (b) five business days after depositing in the mail, if delivered by mail; or (c) the next business day after delivery to express courier service, if delivered by express courier service.

| | |
|---|---|
| **If to Franchisor:** | **If to Franchisee:** |
| Days Inns Worldwide, Inc | Golden Treasury II, LLC |
| 22 Sylvan Way | 220 BRAVO TERRACE |
| Parsippany, NJ 07054 | PORT ORCHARD, WA, 98366 |
| Attn: SVP, Contracts Administration | |

**With a copy to:**
Wyndham Hotel Group, LLC
22 Sylvan Way
Parsippany, NJ 07054
Attn: General Counsel

## 16. MISCELLANEOUS

**16.1 Force Majeure.** If performance by either Party is delayed or prevented (excluding the obligation to make payments under this Agreement) because of strikes, inability to procure labor or materials, defaults of suppliers or subcontractors, delays or shortages of transportation, failure of power or communications systems, restrictive governmental laws or regulations, weather conditions, or other reasons beyond the reasonable control of the Party, then performance of such acts will be excused and the period for performance will be extended for a period equivalent to the period of such delay.

**16.2 Entire Agreement.** This Agreement and any attachments hereto, constitutes the entire, final and exclusive agreement and understanding of the Parties with respect to the subject matter hereof and supersedes all prior or contemporaneous statements, representations, negotiations, discussions, understandings and agreements, whether oral or written, with respect to the subject matter of this Agreement.

**16.3 Franchisee's Forms.** Franchisor is not bound by any terms of Franchisee's purchase order forms or notices of acceptance which attempt to impose any conditions at variance with the terms and conditions of this Agreement or with Franchisor's invoices, standards manuals or technical specifications. Franchisor's failure to object to any provision contained in Franchisee's printed form is

not a waiver of any provision of this Agreement.

**16.4  No Third Party Beneficiary.** The Agreement is intended for the sole benefit and protection of the named Parties, their successors and permitted assigns, and no Third Party shall have any cause of action or right to payments made or received herein except for any owners of any software who have licensed or authorized Franchisor to sublicense the same to Franchisee.

**16.5  Prevailing Party Attorneys' Fees.** In the event of an alleged breach of this Agreement, the prevailing Party shall be entitled to reimbursement of all of its costs and expenses, including reasonable attorneys' fees, incurred in connection with such dispute, claim or litigation, including any appeal therefrom. For purposes of this Section, the determination of which Party is to be considered the prevailing Party shall be decided by the court of competent jurisdiction that resolves such dispute, claim or litigation.

**16.6  Other Relief.** Franchisor may obtain the remedy of injunctive relief without the posting of a bond if Franchisee violates its obligations regarding confidentiality, non-disclosure, transfer or limitations on the SaaS Solution use under this Agreement. Notwithstanding anything contained in this Agreement to the contrary, each Party shall be entitled to seek injunctive or other equitable relief whenever the facts or circumstances would permit such Party to seek such equitable relief in a court of competent jurisdiction.

**16.7  Modifications.** This Agreement may not be amended, modified or rescinded except in writing, signed by both Parties, and any attempt to do so shall be void and of no effect. This Agreement may be modified or amended only pursuant to a separate writing mutually agreed upon and signed by both Parties. The Parties expressly disclaim the right to claim the enforceability or effectiveness of: (a) any oral modifications to this Agreement; and (b) any other amendments that are based on course of dealing, waiver, reliance, estoppel or other similar legal theory. The Parties expressly disclaim the right to enforce any rule of law that is contrary to the terms of this Section.

**16.8  Governing Law; Exclusive Jurisdiction.** The validity, construction and performance of this Agreement, and the legal relations among and any disputes between the Parties to this Agreement, shall be governed by and construed in accordance with the laws of the State of New Jersey, excluding that body of law applicable to conflicts of law that would apply the substantive law of another jurisdiction. Any suit or proceeding relating to this Agreement shall be brought only in the state and federal courts located in the State of New Jersey. The Parties hereby expressly consent to the exclusive personal jurisdiction of the New Jersey state courts situated in Morris County, New Jersey, and the United States District Court for the District of New Jersey. Each Party hereby waives any right it may have to assert the doctrine of forum non conveniens or to object to venue with respect to any suit or proceeding brought under this Agreement.

**16.9  Waiver.** If either Party fails to exercise any right or option at any time under this Agreement, such failure will not be deemed a waiver of the exercise of such right or option at any other time or the waiver of a different right or option. Termination of this Agreement by either Party will not waive Franchisee's obligation to make any payments to Franchisor under this Agreement.

**16.10 Headings.** The division of this Agreement into sections and the use of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement. The terms "Agreement," "herein," "hereof," "hereunder" and similar expressions refer to this Agreement and not to any particular section or other portion hereof and include any Schedules or agreements supplemental hereto. Unless something in the subject matter or context is inconsistent therewith, references herein to sections are to sections of this Agreement.

**16.11 No Construction Against Drafter.** The Parties agree that any principle of construction or rule of law that provides that an agreement shall be construed against the drafter of the agreement in the

DocuSign Envelope ID: B6669BCA-EF5B-4B1B-8A60-5F3ADCB196F6

event of any inconsistency or ambiguity in such agreement shall not apply to the terms and conditions of this Agreement.

**16.12 Counterparts.**  This Agreement may be executed in one (1) or more duplicate originals, all of which together shall be deemed one and the same instrument.

**16.13 Severability.**  If any provision of this Agreement is determined to be void or unenforceable, the provision shall be deemed severed from the Agreement and the remainder of this Agreement shall continue in full force and effect.

**16.14 Successors and Assigns.**  This Agreement shall inure to the benefit of and be binding upon the Parties, their successors and permitted assigns. Notwithstanding the above, Franchisee may not assign this Agreement without Franchisor's express written consent.

**16.15 Mediation.**  The Parties agree that all disputes arising under this Agreement or associated with the SaaS Solution may be submitted to non-binding mediation under the National Franchise Mediation Program supervised by the Center for Public Resources (CPR) Institute for Dispute Resolution, 366 Madison Ave., New York, NY 10017; email: info@cpradr.org.

**16.16 Survival.**  The provisions of this Agreement that due to their content should have continuing life shall survive the termination of this Agreement.

**16.17 Treatment of Prior Agreements.**  In the event Franchisee has an existing WynGuest Agreement ("**Existing Agreement**") or Beta Test Program Agreement ("**Beta Agreement**") with Franchisor or one of Franchisor's Affiliates, such Existing Agreement or Beta Agreement shall automatically terminate on the Acceptance Date. The subject matter of any Existing Agreement or Beta Agreement, including any rights and obligations thereunder, shall be subject to and exclusively governed by such Existing Agreement or Beta Agreement. No provision, term, condition, right or obligation contained in any Existing Agreement or Beta Agreement, regardless of whether such provision, term, condition, right or obligation survives the termination of such Existing Agreement or Beta Agreement, shall apply to or otherwise affect this Agreement or the subject matter hereof.

**16.18 Release of All Claims by Franchisee.**  Franchisee, for itself and its Affiliates, hereby irrevocably releases and forever discharges Franchisor and its Affiliates of and from any and all claims, causes of action or damages, whether legal or equitable, arising from or under or related to its Existing Agreement or Beta Agreement, if any, with Franchisor or its Affiliates. Franchisee shall indemnify, defend and hold harmless Franchisor and its Affiliates from and against any claims or causes of action made against Franchisor or its Affiliates by Franchisee, its Affiliates or any Third Party which arise under or relate to its Existing Agreement or Beta Agreement, if any.  Franchisee acknowledges, understands and agrees that the foregoing release is expressly intended to cover and include, without limitation, all claims, past or present, known or unknown, suspected or unsuspected, accrued or unaccrued, asserted or unasserted, which can or may ever be asserted by assignees, successors or otherwise, as the result of the matters herein released, or the effects or consequences thereof based upon acts or omissions from the beginning of time through the Acceptance Date. Franchisee hereby irrevocably and forever waives all rights it may have arising under any statute or common law principle with respect to a general release of unknown or unsuspected claims, causes of action or damages, and Franchisee agrees to expressly waive any rights it may have under any such statute or common law principle.

*[Signature Page Follows]*

DocuSign Envelope ID: B6669BCA-EF5B-4B1B-8A60-5F3ADCB196F6

**IN WITNESS WHEREOF**, the Parties hereto have executed, or caused to be executed by their duly authorized representatives, this Agreement as of the Effective Date.

**Franchisor**

By: *Michael Piccola*
    62CC98F453C8404...

Name: Michael Piccola

Title: Senior Vice President, Contracts Administration

**Franchisee**

By: *Chong Yi*
    A395831946A9478...

Name: Chong Yi

Title: (Vice) President / Managing Member / Authorized Signatory

DocuSign Envelope ID: B6669BCA-EF5B-4B1B-8A60-5F3ADCB196F6

## SCHEDULE 1.1

### Definitions

"**Access Credentials**" means any user name, identification number, password, license or security key, security token, PIN or other security code, method, technology or device used, alone or in combination, to verify End Users' identity and authorization to access and use the SaaS Solution.

"**Affiliate**" means any and all subsidiaries, affiliates, corporations, limited liability companies, partnerships, firms, associations, businesses, organizations, and/or other entities that directly or indirectly (either presently or in the future and/or through one or more intermediaries) control, are controlled by, or are under common control with, the subject entity (with respect to Franchisor, including Franchisor's parent company, Wyndham Worldwide Corporation) and/or such entities.

"**Commitment Period**" means the Commitment Period identified in the Existing Agreement (if applicable), or if no Existing Agreement exists, five (5) years following the Acceptance Date.

"**Communication Services**" means the Internet connectivity services Franchisee uses for purposes of accessing and using the SaaS Solution.

"**End User**" means a person who is authorized by Franchisor, or who is otherwise permitted under this Agreement, to access and use the SaaS Solution, including without limitation, Franchisee.

"**Facility**" means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing or to be constructed at the Location on or after the effective date of the Franchisee Agreement.

"**Franchise Agreement**" means the License or Franchise Agreement between Franchisee and Franchisor granting to Franchisee the non-exclusive right to operate the Facility under the System.

"**Guest Information**" means any names, e-mail addresses, phone numbers, mailing addresses and other information about guests and customers of the Facility, including, without limitation, stay information, that either Franchisor or Franchisee or a person acting on behalf of one or both of them receives from or on behalf of the other or any guest or customer of the Facility or any other Third Party.

"**Hardware**" means the computer hardware, peripheral equipment, ancillary equipment, the operating system software and related documentation that Franchisee uses for purposes of accessing and using the SaaS Solution.

"**Intellectual Property**" means any and all rights existing from time to time under patent law, copyright law, trademark law, trade secret law, and any other proprietary rights laws and regulations as well as any related applications, reissuances, continuations, continuations-in-part, divisionals, renewals, extensions, and restorations thereof, now or hereafter in force and effect anywhere in the world.

"**Permitted Use**" means use of the SaaS Solution by End Users for the benefit of Franchisee solely in or for Franchisee's business operations as contemplated for and in accordance with the Franchise Agreement.

"**Services**" shall mean Additional Services, CRISP Services and Maintenance and Support Services.

"**System**" means the comprehensive system for providing guest lodging facility services under the Marks as Franchisor specifies which, at present, includes only the following: (a) the Marks; (b) other intellectual property including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity, and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

"**Third Party**" means persons and entities other than Franchisor and Franchisee.

DocuSign Envelope ID: B6669BCA-EF5B-4B1B-8A60-5F3ADCB196F6

"**WynGuest Agreement**" means an agreement between Franchisor and certain franchisees which governs such franchisees' access to and use of the WynGuest property management system.

DocuSign Envelope ID: B6669BCA-EF5B-4B1B-8A60-5F3ADCB196F6

## SCHEDULE 2.1

### The SaaS Solution

The SaaS Solution means the SynXis Property Management System, which as of the Effective Date includes the following features and functionality:

— Web-based solution, which may include a local smart client

— Community model hosting by Sabre Hospitality Solutions, or an affiliate thereof

— Beginning 60-90 days from the Acceptance Date, interface with Infor's EzLITE automated revenue management system, which analyzes all PMS data to create property-specific, unconstrained demand models

      • The EzLITE system will offer daily recommendations regarding Best Available Rate ("**BAR**") and stay control.

           • Recommendations are based on 6 BAR rates entered by Franchisee.

           • Franchisee must accept or override recommendations daily between specified hours, otherwise recommendations will be automatically uploaded into the SynXis Property Management System.

— In-system training materials

DocuSign Envelope ID: B6669BCA-EF5B-4B1B-8A60-5F3ADCB196F6

## SCHEDULE 2.3

### Implementation Services

Franchisor will offer Implementation Services consisting of assistance in installation/implementation of the SaaS Solution including the following:

- Assistance with setup of two (2) Elavon tokenization terminals (to be provided in connection with execution of Elavon Agreement)
- Installation of SaaS Solution for Facility's front desk (Hardware to be provided by Franchisee)
- Training modules regarding features and functionality of SaaS Solution, including video demonstrations and tutorials
- Remote and optional on-site resources including training of Facility's staff

DocuSign Envelope ID: B6669BCA-EF5B-4B1B-8A60-5F3ADCB196F6

## SCHEDULE 4.2
### CRISP Services

**Terms of CRISP Services**

Franchisee agrees to establish the best available rate "**BAR**"; provided, however that Franchisee acknowledges and agrees that it will retain ultimate control over all revenue management decisions. Subject to the foregoing, Franchisee explicitly authorizes Franchisor to make adjustments to the Facility's rates, inventory and restrictions in order to comply with the Required Policies and Practices without advance notice to Franchisee. Franchisor shall not, however, change the BAR without authorization from Franchisee. In addition, Franchisee may modify or reverse any change Franchisor may make by notifying Franchisor, provided that such modification or reversal is consistent with the Required Policies and Practices. Franchisee's general manager shall be its primary representative who shall have the authority to make revenue management decisions for the Facility, unless Franchisee designates another Facility representative in writing to Franchisor. Franchisor may communicate with Franchisee's representative by telephone, e-mail or in another manner, and Franchisor may rely on any communication which Franchisor believes, in good faith, is from Franchisee's representative. Any know-how, algorithms, formulae, data, recommendations, documentation, software, or other materials or information that Franchisor furnishes to Franchisee in connection with the CRISP Services shall be deemed "Confidential Information" as defined in the Franchise Agreement and shall be subject to all prohibitions on disclosure, copying or use of Confidential Information under the Franchise Agreement.

**Overview of CRISP Services**

Property Audit & Setup

In consultation with the Facility representative, simplify rates and room type structures by:
- Verifying that all required rate plans are loaded correctly in the SaaS Solution;
- Verifying that local rates are available for sale in the distribution channels selected by the Facility;
- Verifying that all brand standard rate plans are available for sale; and
- Verifying that all hotel specific data is accurate and up to date in all systems.

Rate & Inventory Management

Review inventory/rate visibility and consistency across all distribution channels. Key services include:
- Monitoring Facility inventory and rate settings in the SaaS Solution;
- Identifying and advising Franchisee of erroneous rate plans;
- Monitoring rates across distribution channels and checking for accuracy in third party channels; and
- Coordinating participation in key corporate accounts and marketing programs.

DocuSign Envelope ID: B6669BCA-EF5B-4B1B-8A60-5F3ADCB196F6

## SCHEDULE 4.3

### Maintenance and Support Services

**First Level of Support**

Franchisor will provide first-level support for the SaaS Solution, which shall include:

- SynXis Property Management System;
- Infor's EzLITZE automated revenue management system; and
- Any additional interfaces included in the SaaS Solution.

Additionally, Franchisor shall field initial inquiries related to the Elavon Non-SaaS Solution Services though support therefor shall be provided as set forth in the Elavon Agreement.

**Second Level of Support**

In the event first level support fails to resolve any maintenance or support issues for the SaaS Solution, Franchisor will provide second level support by putting Franchisee in contact with the appropriate Third Party provider of the SaaS Solution.

**Franchisee Obligations**

Franchisee shall perform all user-required maintenance procedures specified by the vendor of the specific Hardware components, and obtain required maintenance only from an authorized service provider.

DocuSign Envelope ID: B6669BCA-EF5B-4B1B-8A60-5F3ADCB196F6

## SCHEDULE 5.1

### Fees

| | |
|---|---|
| **With up to Three Interfaces\*** | $565 per month\*\* |
| **One-Time Start-Up Fee** | $1,400\*\* |
| **One-Time Transfer Fee (if applicable)** | $500 |

\* **"Interface"** means any interface you may choose to include, which may be necessary for features relating to, for example, voicemail, call accounting, etc. The Elavon tokenized credit card interface and Infor EzLITE interface are included in the monthly price listed above.

\*\* Franchisees with Existing Agreements shall pay modified Fees as follows:

(1)      the One-Time Start-Up Fee shall not apply; and

(2)      (a)      Franchisees with an Existing Master Subscription Agreement or an Existing WynGuest Agreement – Subscription Model shall pay the monthly fee paid under the Existing Agreement in the month immediately preceding the month in which the Acceptance Date occurs through the second anniversary of the Acceptance Date; or

(b)      Franchisees with an Existing Software and Services Agreements or an Existing WynGuest Agreement – Upfront Model shall pay the monthly fee paid under the Existing Agreement in the month immediately preceding the month in which the Acceptance Date occurs through the later of:

(i)      the second anniversary of the Acceptance Date; or

(ii)      the fourth anniversary of the Acceptance Date under the Existing Agreement.

For the avoidance of doubt, the type of Existing Agreement, amount of Existing Monthly Fee, and Acceptance Date of Existing Agreement that shall be applicable to this Agreement are set forth in the chart below.

| **Existing Agreement** | **Existing Monthly Fee** | **Acceptance Date of Existing Agreement** |
|---|---|---|
| WG Up Front | 227.28 | 12/3/2008 |

DocuSign Envelope ID: B6669BCA-EF5B-4B1B-8A60-5F3ADCB196F6

## SCHEDULE 6.1

### Minimum Technical Specification Requirements

1. Windows 7 or higher

2. 4GB+ of RAM

3. 2GHz processor (32 or 64 bit) or greater

4. 1GB+ Available Disk Space

5. The Microsoft .NET Framework Version 4.0

6. Internet Explorer 9 or Firefox 4.0 must be set as the default browser on the SaaS Solution

7. Screen resolution should be set to at least 1024x768

8. To save/view reports Acrobat 9 or higher is required (or compatible pdf reader)

9. Elavon Fusebox connectivity from two way interface

10. Elavon imaged Ingenico Swipe devices with outbound access to Fusebox

11. Elavon Webapp access (manual processing pop-up window)

# EXHIBIT C

## AMENDMENT TO FRANCHISE AGREEMENT

THIS "AMENDMENT" is made and entered into as of this ___ day of _____, 2014, ("Amendment Date") by and between **DAYS INNS WORLDWIDE, INC.**, a Delaware corporation ("we", "us" or "our"), **GOLDEN TREASURY II, LLC, a Washington limited liability company** ("you", or "your"), and Margaret Yi and Chong S. Yi (the "Guarantors"). This Amendment supplements that certain Franchise Agreement dated April 18, 2007 (the "Franchise Agreement"), relating to a license to operate a Days Inn® System Unit located at 220 Bravo Terrace, Port Orchard, WA 98366, designated as Unit #14080-70637-03 (the "Facility"). To the extent of any conflict between the Franchise Agreement and this Amendment, the Amendment shall control.

IN CONSIDERATION of the mutual agreements herein contained, and promises herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties, it is agreed as follows:

1.     The Franchise Agreement is hereby amended by deleting Section 18.1, Your Termination Right, in its entirety.

2.     The Franchise Agreement is further amended to add a Section 18.3 to read as follows:

**18.3.   Combined Fees.** Notwithstanding Section 7.1, you will pay a Combined Fee consisting of the Royalty and System Assessment Fee at the rates set forth in this Section. The Combined Fee excludes commissions and related service charges, guest complaint assessments, Internet and GDS Fees, the Loyalty Program Charge and other similar fees and charges described on Schedule C which must be paid as stated in this Agreement. The discount from the Royalty and System Assessment Fees set forth in Section 7 that the Combined Fee represents (the "Discount Amount") shall first be applied to any applicable reservation fee and any remaining Discount Amount shall be applied evenly between the Royalty and System Assessment Fee.

18.3.1 The Combined Fee shall be six and eight tenths percent (6.8%) of Gross Room Revenues accruing on the Amendment Date and continuing through to the second anniversary of the Amendment Date; and

18.3.2 The Combined Fee shall be seven and eight tenths percent (7.8%) of Gross Room Revenues accruing on the second anniversary of the Amendment Date and continuing through to the third anniversary of the Amendment Date; and

18.3.3 The Royalty and System Assessment Fees shall be computed and paid at the rates specified in Section 7.1 on Gross Room Revenues accruing after the third anniversary of the Amendment Date.

18.3.4   The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Royalty and System Assessment Fees shall reset to the rates specified in

Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default, or (ii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of less than 80% (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of more than 80% in a re-inspection to be performed not less than 60 days after the initial inspection.

3. <u>Confidentiality</u>. You acknowledge that the existence of this Amendment and the granting of the benefits herein are strictly confidential between us and you. Part of the consideration received by us for granting the benefits is your obligation to maintain confidentiality about this Amendment and its benefits. Therefore, you agree not to disclose to any person or entity the existence or subject matter of this Amendment, or the benefits granted hereunder, except under compulsion of law or to attorneys or accountants as needed for assistance with representation of or advice to you. Within your organization, information about this Amendment will be disclosed to agents, officers, affiliates and contractors on a "need to know" basis only. If you violate this confidentiality obligation, no further benefits will be available from that time and thereafter, to the extent that the benefits have not then been fully utilized upon written notice from us.

4. <u>Release</u>. You and Guarantors, on behalf of yourselves, your partners, officers, employees, directors, shareholders, representatives, agents and your successors and assigns, hereby release and hold harmless us, our officers, employees, agents, directors, shareholders, representatives, affiliates, parent entities and subsidiaries (collectively, "Releasees") and the predecessors, successors and assigns of the Releasees, from any and all claims and causes of action whatsoever arising prior to and through the date of this Amendment relating to the offer, sale, administration, negotiation, default, and/or performance of the Franchise Agreement for the Facility.

5. Except as expressly stated in this Amendment, no further additions, modification or deletions to the Franchise Agreement or the Guaranty Agreement are intended by the parties or made by this Amendment.

6. <u>Execution in Counterparts</u>. To facilitate execution of this Amendment by geographically separated parties, this Amendment, and all other agreements and documents to be executed in connection herewith may be executed in as many counterparts as may be required; and it shall not be necessary that the signatures on behalf of each party appear on each counterpart; but it shall be sufficient that the signature on behalf of each party appear on one or more of the counterparts. All counterparts shall collectively constitute a single agreement. It shall not be necessary in making proof of this Amendment to produce or account for more than a number of counterparts containing the respective signatures on behalf of all the parties hereto. All facsimile executions shall be treated as originals for all purposes.

2

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date indicated above:

**DAYS INNS WORLDWIDE, INC.**

By: _____
     Michael Piccola, SVP

**GOLDEN TREASURY II, LLC**

By: _____
     Manager

**GUARANTORS:**

By: _____
     Chong S. Yi

By: _____
     Margaret Yi

3

# <u>EXHIBIT D</u>

## GUARANTY

To induce Days Inns Worldwide, Inc., its successors and assigns ("you") to sign the License Agreement (the "Agreement") with the party named as the "Licensee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Licensee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Licensee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Licensee and notice from you we will immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of Licensee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Licensee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

WITNESSES:                              GUARANTORS:

_Audry Kim_                             _U Chung Aam_ (Seal)
                                        Chong S. Yi

_Young Lim_                             _Margaret Yi_ (Seal)
                                        Margaret Yi

35

# **EXHIBIT E**

# WYNDHAM

## HOTELS & RESORTS

Contracts Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 • fax (800) 880-9445

January 9, 2020

**VIA 2 DAY DELIVERY METHOD**

Mr. Jack Edwards
Golden Treasury II, LLC
220 Bravo Terrace
Port Orchard, WA 98366

RE:   **ACKNOWLEDGMENT OF TERMINATION** of the License Agreement for Days Inn
® by Wyndham System Unit #14080-70637-03 located in Port Orchard, WA (the
"Facility")

Dear Mr. Edwards:

Days Inns Worldwide, Inc., ("we", "our" or "us") has received a letter from Ching Yi, dated December 10, 2019, advising us that on January 7, 2020, (the "Termination Date"), Golden Treasury II, LLC ("you" or "your") plans to sell the Facility to a new owner thereby affording us the opportunity to terminate the Franchise Agreement, dated April 18, 2007 (the "Agreement"). Accordingly, your license to operate the Facility in the Days Inn System will terminate on the Termination Date.

The Agreement requires you to perform certain post-termination obligations. In addition to other obligations specified in the Agreement, by no later than ten (10) days from the delivery date of this letter, you must (a) remove all signage and other items bearing the Days Inn Marks; (b) perform all post-termination obligations specified in the Systems Standards Manual; (c) change all signs, billboards, and listings in telephone directories, travel guides, hotel indexes and similar materials in which the Facility is identified as a Days Inn facility; and (d) remove the Days Inn Marks from any advertising or promotional activities on, around or directed towards the Facility, including any web sites, web pages or search engines. You must cooperate fully with us regarding any post-termination inspections by us to verify that the Facility has been properly de-identified. You must immediately return to us all training documents, operating manuals and other proprietary material.

Because the Agreement will terminated, you must pay us Liquidated Damages of $210,700.51, as specified in Section 12.1 of the Agreement. You must also pay any outstanding Recurring Fees and any other fees and charges through the date you complete the de-identification of the Facility. We estimate that, as of January 9, 2020, you owe us $22,888.25 in such fees and charges. Please pay us this amount within fourteen (14) days. Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to your Guarantor.

        
       

Mr. Jack Edwards
January 9, 2020
Page Two

Please know that, because the Agreement will terminate, you will also lose the right to continue to use the seamless interface version of your property management system. You must make arrangements with the software vendor for a new license to use the property management system. Please be advised that due to the termination you will have no functionality from the system. If you wish to continue using an independent version of the SynXis software, please contact Sabre at 877-520-3646. If your property is planning to migrate to another property management system, please contact your provider to expedite the installation. If you would like to inquire about the data maintained in the system, please contact Hotel Technology Client Support at 855-849-3487 to obtain reporting of that data.

Should you have any questions regarding this matter, please contact Joan Jarrett, Settlements Coordinator at (973) 753-7788.

Sincerely,

Joe Maida
Director
Contracts Compliance

Enclosure

cc:    Chong Yi (Guarantor)
       Margaret Yi (Guarantor)
       Patrick Breen
       Joan Jarrett
       Michael Piccola
       Suzanne Fenimore

# ITEMIZED STATEMENT

Report Date: 09-Jan-2020

| | |
|---|---|
| As of Date (DD-MMM-YYYY) | : 09-Jan-2020 |
| Customer No | : 14080-70637-03-DAY |
| Category Set | : |
| Category Group | : |
| Group No | : |
| Bankruptcy | : No Bankruptcy Sites |
| Disputed | : No |
| Finance Charges Included | : Yes |
| | |
| Customer No | : 14080-70637-03-DAY |
| Address | : 220 Bravo Terrace,Port Orchard,WA,98366,US |
| As of Date | : 09-Jan-2020 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| OCT-2019 | 21757683 | 10/22/2019 | WR GOFREE REIMBURSEMENT | | -159.24 | 0.00 | 0.00 | -159.24 |
| | | | | Sub Total: | -159.24 | 0.00 | 0.00 | -159.24 |
| NOV-2019 | 21758305 | 11/22/2019 | WR ENROLLMENT FEE CREDIT | | -1,257.03 | 0.00 | 0.00 | -1,257.03 |
| | 21758646 | 11/22/2019 | WR GOFREE REIMBURSEMENT | | -99.21 | 0.00 | 0.00 | -99.21 |
| | 21762844 | 11/22/2019 | WYNREWARDS 5% | | 4,366.84 | 0.00 | 0.00 | 4,366.84 |
| | 32086848 | 11/25/2019 | Digital PFP Billing | | 348.14 | 0.00 | 0.00 | 348.14 |
| | 32095258 | 11/25/2019 | TRAINING ACCESS FEE | | 75.00 | 0.00 | 0.00 | 75.00 |
| | 32096116 | 11/26/2019 | October 2019 GDS & Connectivity Fee | | 380.50 | 0.00 | 0.00 | 380.50 |
| | 44659796 | 11/30/2019 | 5335A-SYNXIS PM SAAS | | 593.25 | 0.00 | 0.00 | 593.25 |
| | 44695997 | 11/30/2019 | Actual-1800A-RESERVATION FEE | | 2,092.07 | 0.00 | 0.00 | 2,092.07 |
| | 44695998 | 11/30/2019 | Actual-1210A-MARKETING FEE | | 1,364.40 | 0.00 | 0.00 | 1,364.40 |
| | 44695999 | 11/30/2019 | Actual-1000A-ROYALTY FEE | | 4,547.98 | 0.00 | 0.00 | 4,547.98 |
| | TA0936057 | 11/12/2019 | T/A COMMISSIONS | | 239.62 | 0.00 | 0.00 | 239.62 |
| | TC0936057 | 11/12/2019 | T/A COMM SERVICE CHG | | 54.81 | 0.00 | 0.00 | 54.81 |
| | TM0936057 | 11/12/2019 | MEMBER BENEFIT COMM | | 45.64 | 0.00 | 0.00 | 45.64 |
| | TP0936057 | 11/12/2019 | AAA PROGRAM | | 28.70 | 0.00 | 0.00 | 28.70 |
| | TR0936057 | 11/12/2019 | TMC / CONSORTIA | | 59.20 | 0.00 | 0.00 | 59.20 |
| | | | | Sub Total: | 12,819.91 | 0.00 | 0.00 | 12,819.91 |
| DEC-2019 | 131323 | 12/06/2019 | RETRAIN-NOV2019-0 | | 400.00 | 0.00 | 0.00 | 400.00 |
| | 131876 | 12/31/2019 | RETRAIN-DEC2019-0 | | 400.00 | 0.00 | 0.00 | 400.00 |
| | 21766509 | 12/31/2019 | WR GOFREE REIMBURSEMENT | | -112.24 | 0.00 | 0.00 | -112.24 |
| | 21767268 | 12/22/2019 | WYNREWARDS 5% | | 807.38 | 0.00 | 0.00 | 807.38 |
| | 32110631 | 12/20/2019 | 2020 DAYS REGL ALLIANCE DUES | | 495.00 | 0.00 | 0.00 | 495.00 |
| | 32114730 | 12/27/2019 | November 2019 GDS & Connectivity Fee | | 292.25 | 0.00 | 0.00 | 292.25 |
| | 32124553 | 12/31/2019 | Digital PFP | | 133.55 | 0.00 | 0.00 | 133.55 |
| | 44705706 | 12/31/2019 | 5335A-SYNXIS PM SAAS | | 593.25 | 0.00 | 0.00 | 593.25 |
| | 44727911 | 12/31/2019 | Accrual-1800A-RESERVATION FEE | • | 1,750.00 | 0.00 | 0.00 | 1,750.00 |
| | 44727912 | 12/31/2019 | Accrual-1210A-MARKETING FEE | • | 1,141.31 | 0.00 | 0.00 | 1,141.31 |

Page 1 of 2

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | 44727913 | 12/31/2019 | Accrual-1000A-ROYALTY FEE | | 3,804.35 | 0.00 | 0.00 | 3,804.35 |
| | TA0943298 | 12/05/2019 | T/A COMMISSIONS | | 384.24 | 0.00 | 0.00 | 384.24 |
| | TC0943298 | 12/05/2019 | T/A COMM SERVICE CHG | | 58.90 | 0.00 | 0.00 | 58.90 |
| | TM0943298 | 12/05/2019 | MEMBER BENEFIT COMM | | 41.78 | 0.00 | 0.00 | 41.78 |
| | TP0943298 | 12/05/2019 | AAA PROGRAM | | 11.09 | 0.00 | 0.00 | 11.09 |
| | TR0943298 | 12/05/2019 | TMC / CONSORTIA | | 46.72 | 0.00 | 0.00 | 46.72 |
| | | | | Sub Total: | 10,227.58 | 0.00 | 0.00 | 10,227.58 |
| | | | | Grand Total: | 22,868.25 | 0.00 | 0.00 | 22,868.25 |

Requested By: Melanie Barbarula

* Please note the accruals on your account are estimates.
Make sure to promptly submit your actual gross room revenue and rooms sold.

## DE-IDENTIFICATION PROCEDURES

**You must complete each of the following within 10 days after the Termination Date:**

1. Remove, replace or cover with an opaque cover the primary Facility signage and all other exterior signage bearing the Days Inn Marks.

2. Remove all interior signage that contains Days Inn Marks.

3. Change advertising billboards to remove Days Inn Marks, including any department of transportation or other highway signage.

4. Stop answering Facility telephone as a Days Inn facility.

5. Remove Days Inn name and Marks from any domain name, advertising and brochures.

6. Return to us or destroy all confidential operations and training manuals.

7. Remove the Days Inn name and Marks from the following items:

   - Guestroom supplies including door signage, ice buckets, cups etc.
   - Bathroom supplies including soap, shampoo, conditioner, etc.
   - Business cards and letterhead
   - Registration cards, folios, guest receipts, including electronic copies
   - Guestroom keys
   - Uniforms and name badges

8. Paint over or remove any distinctive Days Inn trade dress, paint schemes or architectural features.

9. Remove Days Inn name from the Facility's listing on TripAdvisor or any other online traveler review site.

10. It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Days Inn facility.

11. We will visit the Facility at any time after 10 days after the Termination Date to verify that you have performed these de-identification obligations.